Michael Catalano, J.
The complaint alleges that in 1957, plaintiff instituted a “telephone answering service for businesses and individuals in the Tonawanda and North Tonawanda area” and still is so engaged; that since that time she has obtained substantial patronage and good will; that plaintiff employed defendant as manager of her business in that area, performing confidential duties, operating the switchboard, securing new customers, supervising accounts and records; that solely through such employment, defendant learned each name of plaintiff’s service; that August 1,1959, defendant left plaintiff’s employ; that while so employed, defendant, unknown to plaintiff, organized a telephone answering service similar to plaintiff’s; that before and after August 1, 1959, defendant solicited each of plaintiff’s subscribers; that, pursuant to a plan to damage plaintiff’s business, defendant now solicits plaintiff’s customers; that defendant has obtained several of plaintiff’s customers; all to plaintiff’s irreparable loss; that defendant has used the name “ McLean Business Service ” without plaintiff’s consent; wherefore, plaintiff demands judgment enjoining defendant from injuring plaintiff’s business, soliciting plaintiff’s customers, using names of plaintiff’s customers, using plaintiff’s name; also, for an accounting of loss of plaintiff’s profits, and damages.
Defendant admits that the plaintiff started said business, built up substantial patronage and good will; that defendant was so employed as manager for plaintiff; that defendant left plaintiff’s employ on two days’ notice to plaintiff; but, denies the rest of the complaint.
Plaintiff owns and operates the “ McLean Business Services,” with offices located in the Tremont Building in North Tonawanda, New York, at 260 Delaware Avenue and in the Chamber of Commerce Building, both in Buffalo, New York. Her services include telephone answering service, direct mailing, addressograph work, secretarial service, space renting. She has been so engaged for seven years.
The telephone answering service consists of having a line from a client’s office into plaintiff’s office, so that the bell rings *94 in both places; when the client does not answer, plaintiff’s employee does. All subscribers to this service do not wish it known because they wish it to appear that a private secretary is answering. All instructions from and all messages for plaintiff’s clients are “purely confidential.”
The North Tonawanda business was purchased by the plaintiff in the late Summer of 1957; the plaintiff hired defendant on June 1, 1958 as a switchboard operator; then on June 13, 1958, defendant became manager of the North Tonawanda office. Defendant’s duties as manager consisted of training the girls especially for the switchboard jobs, being in charge of the office, taking care of the schedules, sending out bills, collecting accounts receivable, adjusting customers ’ complaints after discussion with the plaintiff, hiring and firing girls with the plaintiff’s approval, servicing accounts, securing new accounts. Defendant was advised of the confidential aspects of managing a telephone answering service, namely, under no circumstances was she to say to a customer this was a telephone answering service unless so instructed by the client; all messages, all instructions, all clients were 11 strictly confidential ’ ’; the office had ‘ ‘ confidential files ” in which the reports were kept; at no time was anything concerning the office to be discussed outside the office.
In late June, 1958, plaintiff and defendant were discussing, one Miss O’Brien who had worked for the plaintiff before defendant did. Plaintiff said it would be a good idea to have a written contract stating that defendant would not compete in business with plaintiff in North Tonawanda, to which defendant replied what protection would she have after building up plaintiff’s business. Plaintiff offered defendant first right to purchase in the event of a sale; if not accepted, defendant would have 30 days’ notice to look for other employment. The agreement was never written.
In September or October, 1958 plaintiff instructed defendant to take two or three hours in the afternoon while being paid by plaintiff to get new customers for the business.
On July 30, 1959, plaintiff first learned that defendant was leaving plaintiff’s employment to go into business for herself.
On Monday, August 3,1959, at a luncheon meeting, defendant informed plaintiff that she had left plaintiff’s employment. Defendant said she had six of the plaintiff’s accounts that were leaving with her.
By August 27, 1959, 15 of plaintiff’s 40 accounts were with defendant.
It is very difficult to secure customers for a telephone answering service. Only specified people in certain businesses are *95 likely customers. Customers for plaintiff’s North Tonawanda office were obtained through defendant as a salesman, also, through direct advertising, direct mail, personalized letters, telephone book advertising, telephone solicitation. There were about seven large mailings consisting of 1,000 each; and weekly small mailings of 10, 15 or 20 each. Usually from a mailing of 1,000, there would be five replies out of which there would be two customers. Defendant would send the personalized letters.
The North Tonawanda business had cost plaintiff $1,560, with 27 accounts on the switchboard. The operation costs include rent of $80 monthly; switchboard $110 to $120 monthly; payroll for five employees, providing 98 hours service per week seven days per week, receiving $1.25 per hour for each day girl and $1 an hour for each night or part-time girl. Most of the 15 customers taken from plaintiff by defendant paid $15.50 or $12.50 a month. Plaintiff was able to accommodate 70 customers on her switchboard without any additional operating costs. The average duration of a customer’s business continued for about two years.
There is another competing telephone service operated by a Mrs. Zietle, whose board was full so that she could not take any more customers.
Plaintiff’s customers include business persons listed in the yellow pages of the telephone book and private homes for temporary service when the owner is away, for example, on vacation.
Some of plaintiff’s customers were contacted by defendant before she had left plaintiff’s employment. Defendant told them she was opening her own answering service; most of plaintiff’s clients were going with defendant; plaintiff’s customers would have to accept defendant’s service immediately or defendant could not accept their accounts; plaintiff would not have many accounts left and would not be able to continue the service ; there would be no other available service; defendant would give her personal service whereas plaintiff could not; most of plaintiff’s accounts were going over to defendant so that plaintiff’s business would probably be discontinued; each transferring customer would not pay for the same month twice; plaintiff might be going out of business.
On July 2, 1959, defendant contacted the Telephone Company concerning a new switchboard. On August 18, 1959, the Telephone Company notified plaintiff of the change of her 15 customers to defendant, whose switchboard was installed the next day.
*96 Defendant knew plaintiff’s business was confidential; defendant learned who plaintiff’s customers were solely because of her employment with plaintiff; defendant sent announcements of her business to each of plaintiff’s customers; defendant knew that many of plaintiff’s customers were required to give 30 days’ notice of cancellation. Defendant told plaintiff’s customers that plaintiff was planning to sell her business, although that was not true. In July or August, 1959 plaintiff had received an offer to purchase her business for $4,240.
Defendant was asked: “ If this (temporary) injunction were removed, do you have any reason to believe that any of the plaintiff’s present customers would go with your service? ” (Parentheses and emphasis supplied.) Her lawyer said: “I don’t object to it.” Defendant answered: “ Well, I don’t know whether anyone would, but I will tell you one thing, if I can get them I will take them.”
The certificate of doing business under an assumed name of “ Twin-Ton Office Services ” was executed by defendant on July 16, 1959. Defendant prepared each of the 15 postal cards sent to the Telephone Company for a change of the 15 customers taken from plaintiff, stating, “ This is to acknowledge the transfer of my telephone-intercept (number stated) from McLean Business Service to Twin-Ton Office Services.”
Generally, an employee who has left his employment will not be restrained from competing with his former employer, unless prohibited by contract or a fiduciary relationship. The employer has no property right in his customers, without something more as between himself and his former employee.
Nevertheless, where the employee assumes a position of trust and confidence, such as being manager of the business, he cannot abuse that position by planning his own competitive business during working hours, then carry out that plan, in whole or in part, while still so employed, then benefit himself to his employer’s detriment after the employment is terminated. (See Duane Jones Co. v. Burke, 306 N. Y. 172, 189; A. S. Rampell v. Hyster Co., 3 N Y 2d 369, 377; Witkop & Holmes Co. v. Boyce, 61 Misc. 126, 132, affd. 131 App. Div. 922; Witkop & Holmes Co. v. Boyce, 64 Misc. 374, 379; Todd Protectograph Co. v. Hirschberg, 100 Misc. 418, 419.) This principle has been extended to the employer’s “list of customers,’.’ as such, obtained through years of effort and advertising, involving time, money, enterprise, and not openly found in well-advertised locations, regardless of the lack of high fidelity cloaking the worlc-a-day duties. (Town Country Serv. v. Newbery, 3 N Y 2d 554, 558.) This principle has not been applied to mere dealers in ‘ ‘ butter and *97 eggs ” and the like, whose customers’ names and addresses were in the public directory or on public display, absent an express contract or fraudulent conduct during employment. (See Boosing v. Dorman, 148 App. Div. 824, 827, affd. 210 N. Y. 529; Abdallah v. Crandall, 273 App. Div. 131, 134; Goldberg v. Goldberg, 205 App. Div. 435, 439; People’s Coat, Apron & Towel Supply Co. v. Light, 171 App. Div. 671, 673, affd. 224 N. Y. 727; Scott & Co. v. Scott, 186 App. Div. 518, 524-525; Kleinfeld v. Roburn Agencies, 270 App. Div. 509, 511.)
Lists of customers or subscribers have received statutory protection of long standing, even to declaring their improper use a misdemeanor. (See Penal Law, § 553, derived from Penal Code, § 642, L. 1881, ch. 676, as amd. by L. 1895, ch. 287, § 1; L. 1900, ch. 588, § 1; L. 1905, ch. 441, § 1.)
Confidential communications hetween physicians' and patients, dentists and patients (Civ. Prac. Act, § 352), as well as between lawyers, their clerks, stenographers, other employees, or other persons obtaining such knowledge, and clients (Civ. Prac. Act, § 353), are privileged and protected.
In this case, the subscribers of the plaintiff serviced by defendant included physicians, dentists and lawyers, whose patients and clients left messages of confidence with the defendant. Many people do not want it known that they communicated with their physicians and lawyers, no less what they communicated to them. Accordingly, this telephone answering service uniquely lends itself to the disclosure of matters of strictest confidence to a person apparently acting as nurse, clerk, secretary, stenographer or other trustworthy employee, whose only identity is a voice answering a telephone ostensibly in the doctor’s or lawyer’s office.
The practice of iniquity (Conviser v. Brownstone & Co., 209 App. Div. 584, 591) or artful scheming (Williams & Co. v. Collins Tuttle & Co., 6 A D 2d 302, 306) may deprive a litigant of a rightful claim. (See State Export Co. v. Mol Shipping and Trading, 155 N. Y. S. 2d 188, 189.)
The manager of a business, as here, owes his employer during Iris employment, a “ duty of the finest loyalty; ” “ something stricter than the morals of the market place; ” “ not honesty alone, but the punctilio of an honor the most sensitive. ” (Cardozo, Ch. J., in Meinhard v. Salmon, 249 N. Y. 458, 463-464.)
Here, defendant owed plaintiff far more than the role of a confidential manager actively planning and preparing to carry out an intent to take plaintiff’s customers, so clearly stated at the trial under oath, in defendant’s own words, “ if I can get them I ivill take them.” (Emphasis supplied.)
*98 AH motions made by the defendant for judgment are denied.
Motion by plaintiff for judgment in her favor is granted to the extent that defendant is enjoined from soliciting plaintiff’s former and present customers, of whom defendant obtained knowledge while in the service of the plaintiff, and from serving the same, with $500 damages and costs.