# MARYLAND METALS, INC. *v.* SIDNEY S. METZNER ET AL.

[No. 100, September Term, 1977.]

*Decided February 1, 1978.*

The cause was argued before SMITH, DIGGES, LEVINE and ELDRIDGE, JJ., and JOHN P. MOORE, Associate Judge of the

Court of Special Appeals, and ANSELM SODARO, Chief Judge of the Eighth Judicial Circuit, specially assigned.

*John J. Sweeney, Jr.,* with whom was *Lynn F. Meyers* on the brief, for appellant.

*Emanuel H. Horn* and *Jacob B. Berkson,* with whom was *Richard F. McGrory* on the brief, for appellees.

LEVINE, J., delivered the opinion of the Court.

In this appeal we consider the extent to which officers and high-level managerial employees may, prior to termination of the employment relationship, make preparations to compete with their corporate employer without violating fiduciary obligations running to the corporation. The chancellor (Rutledge, J.), sitting in the Circuit Court for Washington County, denied the request of appellant, Maryland Metals, Inc., for injunctive relief and damages against two former employees and corporations formed by them (appellees here), ruling that the individual appellees had not acted wrongfully in merely preparing to form and finance a competitive enterprise before severing their ties with appellant. Upon issuance of an order dismissing its amended bill of complaint, appellant noted an appeal to the Court of Special Appeals, but we granted certiorari in advance of oral argument in that court. We now affirm.

I

Appellant, located in Hagerstown, is engaged in the business of buying, processing and selling scrap metal obtained from automotive, industrial and miscellaneous sources. Prior to its incorporation in 1955, the company had been operated as a sole proprietorship by the late Harry Kerstein (Harry), who founded the business in the 1930's and later became the corporation's sole stockholder. On his death in June 1973, he was succeeded as president by his son,

Robert Kerstein (Robert), a graduate of the University of Pennsylvania, Wharton School of Finance.

In 1951, Harry engaged, at a starting salary of $85 per week, appellee Sidney S. Metzner (Metzner), who was then recently graduated from college with a degree in business administration and had been employed by a national retail chain in its management training program. With Metzner playing a major role, the business grew and prospered in the ensuing years. On formation of the corporation in 1955, he was named secretary. By June 1974, when he resigned, Metzner had risen to the position of executive vice president and was earning in excess of $80,000 a year. In 1970, appellant employed appellee George W. Sellers, III (Sellers), on Metzner's recommendation, at a starting annual salary of $20,000. Initially Sellers occupied the position of operations manager because of his proven talents in maintaining heavy machinery. He gradually demonstrated managerial capability as well and at the time of his dismissal in late May 1974, held the position of vice president in charge of operations, earning in excess of $31,000 a year.

Rapid technological advances in the design and manufacture of scrap processing machinery contributed significantly to the genesis of this dispute. In 1966, appellant purchased at a total cost of some $400,000 a piece of equipment described in the trade as a guillotine shear.[1] Even as it was awaiting delivery of the shear, appellant was already studying the potential of a newer and more revolutionary machine known as a "shredder."[2]

---

1. Roughly speaking, a shear transforms compressed automobile hulks into slabs. It accomplishes this by a pressing and shearing action in which a ram forces the automobiles under a guillotine head that shears them. After the slab emerges from the mouth of the shear, it is placed upon a conveyor that delivers it to a railroad car for direct shipment to a steel mill. Because the sheared slab contains "contaminants," such as seats, headliners and other non-metal objects, it is rated only as a No. 2 grade of scrap.

2. The "shredder" consumes the same "raw materials" as the shear, but is even more sophisticated and delivers an altogether different product. Despite its name, it does not tear or rip the hulks, but fractures and breaks them into shreds through the action of tough steel hammers. It is the second phase of the process, however, that is most significiant. Intricate separating devices segregate metal from non-metal and steel from non-steel. The

Between 1966 and 1973, Metzner was dispatched on several assignments to inspect shredding operations in other parts of the country. On returning from certain key inspection trips, he submitted recommendations urging the acquisition of a shredder. His last such report and recommendation was dated May 1, 1974, only four weeks before he tendered his resignation.

In September 1970, appellant's board of directors authorized Harry Kerstein to purchase a shredding machine from Newell Manufacturing Company of San Antonio, Texas, one of two leading manufacturers of such machines, for the sum of $384,000. Appellant thereupon entered into a cancellable purchase agreement with Newell and also acquired an option to purchase some 40 acres of land in the Hetzler Industrial Park near Hagerstown, which was suitable for a shredding operation from both a physical and a zoning standpoint. Several weeks later, however, appellant's board of directors voted to defer purchase of the shredding machine, citing several reasons, including a downward trend in the market price for shredded scrap, which apparently proved to be temporary, and some uncertainty as to the proficiency of the machine. Consequently the order was cancelled and the option on the land allowed to expire without being exercised.

Following Harry's death in June 1973, appellant resumed its interest in a shredding operation. Once again Metzner, now assisted by Sellers, was instructed to conduct an appropriate investigation in the summer and fall of 1973, and to report the outcome of those efforts to the corporation. Metzner and Sellers complied with these instructions in some detail and urged Robert to acquire a shredder immediately.

What transpired beginning in November 1973, is the subject of some dispute in the testimony. Metzner maintains that he had a discussion with Robert in November during which he expressed his unwillingness to continue with

---

finished product, therefore, is uncontaminated scrap that sells as a No. 1 or premium grade, and therefore brings a higher price on the market than does No. 2 grade scrap metal.

appellant unless he could own some equity in the corporation. Robert replied that this was impossible because his father, as sole stockholder, had transferred his holdings to a testamentary trust. According to his testimony, Metzner then proposed that a new corporation be formed to acquire and operate a shredder in which he, Sellers and Robert (or appellant) would each own a one-third interest, with the necessary initial capital investment of some $300,000 being advanced by Robert or appellant. Robert acknowledges the substance of this discussion, but beyond this point the Metzner-Sellers version of what occurred differs in one material respect from Robert's account. Metzner testified that he than flatly advised Robert that if he would not join with Metzner and Sellers in the equal ownership of a shredder, they would purchase and operate one without his participation. This was corroborated by Sellers who had held his own independent discussion with Robert.

Conceding the first part of the discussion, Robert maintained that he never received explicit notice of any intention on the part of Metzner or Sellers to leave Maryland Metals and to start their own competing business. He testified that he had merely offered to consider the possibility of a profit-sharing plan for both Metzner and Sellers. Robert further claims to have informed them unequivocally in November that he would not consider any arrangement in which he or Maryland Metals did not own the entire shredding operation.

In the meantime Metzner and Sellers had initiated in November a series of steps preparatory to the establishment of a shredding facility independent of Maryland Metals. These measures, which we shall recount later, are the basis for the present dispute. Professing to be unaware of the preparations being made by Metzner and Sellers, Robert raised Sellers' salary in March 1974 from $25,000 to $31,200. Despite the plans being made by Sellers and Metzner in 1974, they both continued until the very last day of their employment, as they had throughout their careers, to apply their considerable talents and to work long hours in behalf of Maryland Metals.

## II

Appellant's principal contention on appeal is that by deliberately failing to disclose in detail their preliminary arrangements to enter into competition with Maryland Metals, while serving as appellant's officers and employees, appellees committed a "gross breach of their fiduciary duty" of loyalty, thereby entitling appellant, as a matter of law, to an injunction restraining further operation of appellees' rival scrap metal processing business.

In defining the scope of the right of an employee or corporate officer to enter into competition with his former principal and in delimiting the countervailing right of an employer to restrain his agent's competitive endeavors both before and after termination of employment, the law seeks to harmonize two important and ofttimes conflicting policies. The first of these policy considerations is that commercial competition must be conducted according to basic rules of honesty and fair dealing. As we stated in *Edmondson Vil. Theatre v. Einbinder,* 208 Md. 38, 44, 116 A. 2d 377 (1955), the tendency of the law, both legislative and common, has been in the direction of enforcing increasingly higher standards of fairness or commercial morality in trade. In policing the ethics and conventions of the marketplace, courts have paid particular attention to problems associated with competition between employees and their former employers. Because corporate managerial personnel enjoy a high degree of trust and confidence in performing their assigned functions, a potential exists for serious abuse of confidentiality whenever personnel attempt to aggrandize their own economic interests at the expense of the employer. Fairness dictates that an employee not be permitted to exploit the trust of his employer so as to obtain an unfair advantage in competing with the employer in a matter concerning the latter's business. *Kademenos v. Equitable Life Assurance Soc. of U.S.,* 513 F. 2d 1073, 1076 (3d Cir. 1975); Restatement (Second) of Agency § 387, Comment b (1957).

This concern for the integrity of the employment relationship has led courts to establish a rule that demands

of a corporate officer or employee an undivided and unselfish loyalty to the corporation. *See Guth v. Loft, Inc.,* 23 Del. Ch. 255, 5 A. 2d 503, 510 (S. Ct. 1939). Thus, we have read into every contract of employment an implied duty that an employee act solely for the benefit of his employer in all matters within the scope of employment, avoiding all conflicts between his duty to the employer and his own self-interest. *C-E-I-R, Inc. v. Computer Corp.,* 229 Md. 357, 366, 183 A. 2d 374 (1962); *Maryland Credit v. Hagerty,* 216 Md. 83, 90, 139 A. 2d 230 (1958); *De Crette v. Mohler,* 147 Md. 108, 115, 127 A. 639 (1925) ("Experience has taught that no man can serve two masters"). *And see Cumb. Coal & Iron Co. v. Parish,* 42 Md. 598, 605-606 (1875) (recognizing a similar duty with respect to corporate directors and officers).

A direct corollary of this general principle of loyalty is that a corporate officer or other high-echelon employee is barred from actively competing with his employer *during* the tenure of his employment, even in the absence of an express covenant so providing. *Ritterpusch v. Lithographic Plate,* 208 Md. 592, 602, 119 A. 2d 392 (1956); *accord, Becker v. Bailey,* 268 Md. 93, 98-99 n.2, 299 A. 2d 835 (1973); Restatement (Second) of Agency § 393 (1957); 3 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 856 (Perm. ed. 1975). Thus, prior to his termination, an employee may not solicit for himself business which his position requires him to obtain for his employer. He must refrain from actively and directly competing with his employer for customers and employees, and must continue to exert his best efforts on behalf of his employer. *C-E-I-R, Inc. v. Computer Corp.,* 229 Md. at 366.

Once the employment relationship comes to an end, of course, the employee is at liberty to solicit his former employer's business and employees, subject to certain restrictions concerning the misuse of his former employer's trade secrets and confidential information. *Ritterpusch v. Lithographic Plate,* 208 Md. at 602; *Abbott Redmont Thinlite Corporation v. Redmont,* 475 F. 2d 85, 89 (2d Cir. 1973).

The second policy recognized by the courts is that of safeguarding society's interest in fostering free and vigorous competition in the economic sphere. Thus, as Judge

Oppenheimer stated for this Court in *Operations Research v. Davidson,* 241 Md. 550, 575, 217 A. 2d 375 (1966):

> "[I]t is important to the free competition basic to our national development as well as to the individual rights of employees who want to go into business for themselves that their spirit of enterprise be not unduly hampered."

Furthermore, courts have been receptive to the view that every person has or at least ought to have the right to ameliorate his socioeconomic status by exercising a maximum degree of personal freedom in choosing employment. *Travenol Laboratories, Inc. v. Turner,* 30 N.C. App. 686, 228 S.E.2d 478, 483 (1976); *see Fulton Laundry Co. v. Johnson,* 140 Md. 359, 362, 117 A. 753, 23 A.L.R. 420 (1922); Comment, 29 U. Chi. L. Rev. 339, 351 (1962); Note, 4 Duke B. J. 16 (1954). *But see* 1 R. Callmann, *The Law of Unfair Competition, Trademarks and Monopolies* § 1.3, at 12 (3d ed. 1967) ("The theory that the employee enjoys the right to a free and open market flagrantly ignores reality").

This policy in favor of free competition has prompted the recognition of a privilege in favor of employees which enables them to prepare or make arrangements to compete with their employers prior to leaving the employ of their prospective rivals without fear of incurring liability for breach of their fiduciary duty of loyalty. *Operations Research v. Davidson,* 241 Md. at 572; *Ritterpusch v. Lithographic Plate,* 208 Md. at 602; *see also United Aircraft Corp. v. Boreen,* 413 F. 2d 694, 700 (3d Cir. 1969); *Keiser v. Walsh,* 118 F. 2d 13, 14 (D.C. Cir. 1941) ("an agent need not wait until he is on the street before he looks for other work"); *Bancroft-Whitney Company v. Glen,* 64 Cal. 2d 327, 49 Cal. Rptr. 825, 411 P. 2d 921, 935 (1966).[3]

   "Admittedly the mere decision to enter into

---

3. Although the line separating mere preparation from active competition may be difficult to discern in some cases, we have stated, following the position taken by the American Law Institute, that an employee may properly, before leaving his employment, purchase a rival business, C-E-I-R, Inc. v. Computer Corp., 229 Md. 357, 366, 183 A. 2d 374 (1962) (dictum); Restatement (Second) of Agency § 393, Comment e (1957), or he may advise

competition will eventually prove harmful to the former employer but because of the competing interests of allowing an employee some latitude in switching jobs and at the same time preserving some degree of loyalty owed to the employer the mere entering into competition is not enough. It is something *more than preparation* which is so harmful as to *substantially hinder* the employer in the continuation of his business." (emphasis added). *Cudahy Company v. American Laboratories, Inc.,* 313 F. Supp. 1339, 1346 (D. Neb. 1970).

Moreover, while an employee is under an obligation to be candid with his employer in preparing to establish a competing enterprise, *C-E-I-R, Inc. v. Computer Corp.,* 229 Md. at 367; *see also Community Counselling Service, Inc. v. Reilly,* 317 F. 2d 239, 244 (4th Cir. 1963), he is not bound to reveal the precise nature of his plans to the employer unless he has acted inimically to the employer's interest beyond the mere failure to disclose. *Cudahy Company v. American Laboratories, Inc.,* 313 F. Supp. at 1346; *Bancroft-Whitney Company v. Glen,* 411 P. 2d at 936.

The right to make arrangements to compete is by no means absolute and the exercise of the privilege may, in appropriate circumstances, rise to the level of a breach of an employee's fiduciary duty of loyalty. Thus, the privilege has not been applied to immunize employees from liability where the employee has committed some fraudulent, unfair or wrongful act in the course of preparing to compete in the future. *Robb v. Green,* [1895] 2 Q. B. 1, 15, *aff'd,* [1895] 2 Q. B. 315. Examples of misconduct which will defeat the privilege are: misappropriation of trade secrets, *Space Aero v. Darling,* 238 Md. 93, 117, 208 A. 2d 74, *cert. denied,* 382 U. S. 843 (1965); misuse of confidential information, *C-E-I-R, Inc. v. Computer Corp.,* 229 Md. at 368; solicitation of employer's customers prior to cessation of employment, *Ritterpusch v. Lithographic*

---

customers with whom he has been in contact of his proposed termination of employment. Operations Research v. Davidson, 241 Md. 550, 572, 217 A. 2d 375 (1966); Aetna Bldg. Maintenance Co. v. West, 39 Cal. 2d 198, 246 P. 2d 11, 15 (1952).

*Plate,* 208 Md. at 602; conspiracy to bring about mass resignation of employer's key employees, *Duane Jones Co. v. Burke,* 306 N. Y. 172, 117 N.E.2d 237, 245 (1954); usurpation of employer's business opportunity, *Raines v. Toney,* 228 Ark. 1170, 313 S.W.2d 802, 809-810 (1958). *See generally* Comment, 22 U. Chi. L. Rev. 278, 282-83 (1954).

Within these broad principles, the ultimate determination of whether an employee has breached his fiduciary duties to his employer by preparing to engage in a competing enterprise must be grounded upon a thoroughgoing examination of the facts and circumstances of the particular case. As the California Supreme Court has observed:

"No ironclad rules as to the type of conduct which is permissible can be stated, since the spectrum of activities in this regard is as broad as the ingenuity of man itself." *Bancroft-Whitney Company v. Glen,* 411 P. 2d at 935.

*Accord, Operations Research v. Davidson,* 241 Md. at 575.

Turning now to the facts in the case at hand, we consider the evidence produced at trial in a light most favorable to the prevailing party; and if substantial evidence is present to support the trial court's determination, it is not clearly erroneous and hence will not be disturbed on appeal. Maryland Rule 886. *Ross v. Hoffman,* 280 Md. 172, 186, 372 A. 2d 582 (1977); *Ryan v. Thurston,* 276 Md. 390, 392, 347 A. 2d 834 (1975); *Delmarva Drilling Co. v. Tuckahoe,* 268 Md. 417, 424, 302 A. 2d 37 (1973).

As we noted earlier, appellees Metzner and Sellers met with appellant's president, Robert Kerstein, in mid-November 1973, after having recently completed a comprehensive study of shredding operations around the country on behalf of Maryland Metals. At the November meeting appellees demanded and were refused an equity participation in Maryland Metals because the company's capital stock was completely tied up in Harry Kerstein's testamentary trust. The chancellor found from the evidence that upon receiving this initial rebuff, appellees then notified Robert that if Maryland Metals was not willing to take a part in a proposed

shredding operation, appellees would go into business for themselves without appellant.[4] Shortly thereafter appellees set in motion a scheme designed to permit them to establish an independent shredding business in the event appellant decided not to participate in the venture. It is this secretive, preparatory effort which appellant claims amounted to a breach of appellees' fiduciary duty to the corporation.

Appellees' initial act was the formation of a Delaware corporation named "Conservit, Inc." on December 11, 1973, which qualified to do business in Maryland on January 14, 1974. It is undisputed, however, that appellees never utilized the Delaware corporation to conduct any business in Maryland or elsewhere. After having made contact with Henry Schloss, a prospective investor from Baltimore, and after having consulted with representatives of the Maryland Economic Development Commission late in 1973, Metzner filed a preliminary application with the Maryland National Bank on January 2, 1974, for a loan to purchase a shredding machine. The loan request was approved on March 14, 1974, in the amount of $1,300,000, but was not actually closed until August 1974, two months after Metzner had left Maryland Metals.

As early as December 1973, Sellers contacted representatives of the Potomac Edison Company concerning the power requirements for the proposed shredder. These negotiations continued through the remainder of appellees' employment. On February 7, 1974, appellees succeeded in securing an option on the same tract of land appellant had considered acquiring in 1970. This option was exercised on June 27, 1974, at a purchase price of approximately $180,000.

---

4. Appellant denies that appellees ever notified it of their intention to establish a competing enterprise and challenges the chancellor's finding to that effect as clearly erroneous. As we see it, however, the giving of the contested notice in this case is not dispositive of the breach of fiduciary duty question. Liability for breach of fiduciary duty is not predicated on an employee's mere failure to disclose preparatory acts, but rather upon "some particular circumstance which rendered the nondisclosure harmful to the corporation or upon the officer's wrongful conduct apart from the omission." Bancroft-Whitney Company v. Glen, 64 Cal. 2d 327, 49 Cal. Rptr. 825, 411 P. 2d 921, 935-36 (1966).

On February 20, 1974, Henry Schloss, on behalf of appellees, and on his own behalf, executed an agreement with Hammermills, Inc. of Iowa for the purchase of a car shredder at a price of $1,200,000. Throughout late winter and spring of 1974, appellees contacted and consulted with various municipal agencies, utility companies, construction contractors, manufacturers and engineers concerning the improvement of the contemplated shredder site and the purchase of equipment necessary to operate and maintain the proposed shredder business.

On May 22, 1974, appellant discharged Sellers, while Metzner submitted his resignation on May 28, 1974, continuing at appellant's request until June 15, 1974, when he ceased all work for Maryland Metals. A Maryland corporation was formed in July 1974 to carry on the business of the nascent enterprise. In that same month the United States Farmers Home Administration agreed to guarantee the loan from Maryland National Bank, which was finally consummated in August 1974. Appellees' shredder operation opened for business in March 1975, some nine months after Metzner had departed from appellant's employ. It is conceded that at no time during the course of their employment did appellees ever inform appellant of the details of their preparations other than to notify Robert of their intention to compete if Maryland Metals was not interested in cooperating in the proposed shredder operation. In fact there is evidence that appellants actively concealed their preparations from appellant.

In sum, from the date of Harry Kerstein's death in June 1973 to the termination of their employment in mid-1974, appellees' various activities were manifestly preparatory in nature. Since, as we have noted earlier, employees are privileged to make arrangements to compete even while they remain on their employer's payroll, it was therefore incumbent upon appellant to demonstrate that appellees had been guilty of unfair, fraudulent or wrongful conduct beyond the mere failure to disclose, which impacted on the economic interest of their former principal in some detrimental fashion.

We are unable to identify any conduct of appellees from June 1973 to June 1974 that was unfair, wrongful or inimical to appellant's interest. Indicative of Metzner's allegiance to the corporation was the undisputed evidence that even in the final months and weeks of his employment, he had negotiated for the sole benefit of his employer a number of valuable contracts yielding profits totalling many thousands of dollars; indeed, Metzner actually consummated at least one of those agreements after submitting his resignation in late May. Likewise, Sellers devoted to his employer approximately 12 hours a day, six days a week during the entire period of his employment, and continued to do so until the very day of his departure. Small wonder, then, that appellant's president admittedly could find no fault with the quality of appellees' services up to the time of their departure.

In all the cases cited by appellant in which a court has granted relief against competition by a former employee, the employee was invariably guilty of serious misconduct other than the mere failure to disclose his plans to compete at some future date. So it was in *Ritterpusch v. Lithographic Plate,* 208 Md. 592, where this Court upheld a jury verdict for the employer against an employee who had actively solicited the employer's major customers on behalf of a competitor with whom the employee intended to associate. Premature customer solicitation was also present in *Sanitary Farm Dairies, Inc. v. Wolf,* 261 Minn. 166, 112 N.W.2d 42 (1961), while the pirating of a highly confidential customer list was declared actionable in *McLean v. Hubbard,* 24 Misc. 2d 92, 194 N.Y.S.2d 644 (1959), *aff'd mem.,* 11 App. Div.2d 1084, 208 N.Y.S.2d 443 (1960). *See also Wessex Dairies Ltd. v. Smith,* [1935] 2 K. B. 80, 89-90 (C.A.).

*C-E-I-R, Inc. v. Computer Corp.,* 229 Md. 357, not only entailed a proven charge of customer solicitation, but also involved improper employee enticement and misuse of confidential and unique information of the employer corporation. To a similar effect is *Standard Brands, Inc. v. U.S. Partition and Packaging Corp.,* 199 F. Supp. 161 (E.D. Wis. 1961), where the court awarded a former employer injunctive relief on the grounds that the defendant employees

had misappropriated numerous drawings and designs belonging to the plaintiff; had solicited numerous employees; and had misappropriated customer goodwill by expending large sums of plaintiff's funds to woo plaintiff's customers, many of whom transferred their business to the defendants after the latter commenced doing business. *See Bancroft-Whitney Company v. Glen,* 411 P. 2d 921 (premature solicitation of employees and misuse of confidential information).

The final case cited by appellant worthy of mention here, *Patient Care Services S.C. v. Segal,* 32 Ill. App.3d 1021, 337 N.E.2d 471 (1975), involved application of the so-called doctrine of "corporate opportunity," an offshoot of the general duty of loyalty owed by corporate officers, directors and upper-level management employees.[5] There it was held that the defendant had breached his duty of loyalty by usurping for his personal benefit the corporation's sole asset — a medical services contract with a local hospital — while still serving as president. The defendant's actions resulted not merely in damaging his former principal, but in effectively destroying it.

In each of the foregoing cases, the defendant employees had clearly exceeded their privilege to prepare for later competition with their employers by committing patently wrongful acts in derogation of the trust and confidence reposed in them by the complaining employers.[6] No such conduct ever transpired here. First, the chancellor expressly

---

[5]. Under the "corporate opportunity" doctrine, corporate personnel are precluded from diverting unto themselves opportunities which in fairness ought to belong to the corporation. Burg v. Horn, 380 F. 2d 897, 899 (2d Cir. 1967); Guth v. Loft, Inc., 23 Del. Ch. 255, 5 A. 2d 503, 511 (S. Ct. 1939); Miller v. Miller, 301 Minn. 207, 222 N.W.2d 71, 78, 77 A.L.R.3d 941 (1974); *see* ⸱Faraclas v. City Vending Co., 232 Md. 457, 463, 194 A. 2d 298 (1963). *See generally* Slaughter, *The Corporate Opportunity Doctrine,* 18 Sw. L.J. 96 (1964); H. Henn, *Handbook of the Law of Corporations* § 237 (1970); 3 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 861.1 (Perm. ed. 1975).

[6]. *But see* Craig v. Graphic Arts Studio Inc., 39 Del. Ch. 447, 166 A. 2d 444 (1960) (holding officer-employee liable for breach of fiduciary duty on grounds that he made 50% capital contribution to new rival corporation, no other acts of fraudulent or unfair misconduct having been found). The *Craig* case has been condemned as bad law by at least one commentator, Newman, *Formation of Competing Enterprise by Corporate Fiduciary,* 3 Hous. L. Rev. 221, 222 (1965), and we decline to follow it here.

found that appellees never solicited appellant's customers during the period of employment. While there was evidence that appellant's business may have suffered somewhat after appellees' shredder business became operational, we have stated that "business energy and initiative by former employees in securing work after their employment has been terminated are not synonymous with treachery during the employment." *Operations Research v. Davidson,* 241 Md. at 563. Likewise, appellant failed to present any evidence tending to show that appellees, prior to their departure, wrongfully lured away or recruited any of its employees.

The chancellor also found as a fact that appellees never misappropriated any trade secrets or other confidential information belonging to appellant. Whatever information appellees acquired regarding the operation and economics of automobile shredders as a result of their inspection tours of shredder sites and other research, was shown by substantial evidence to have been generally available to the public through trade and government publications. This Court has long subscribed to the view that an employee enjoys a right, in competing against his former employer, to utilize general experience, knowledge, memory and skill — as opposed to specialized, unique or confidential information — gained as a consequence of his employment. *Operations Research v. Davidson,* 241 Md. at 567-69; *see generally* 2 R. Callmann, *Unfair Competition, Trademarks and Monopolies* § 54.2(a) (3d ed. 1968).

Finally, we cannot say that appellees were guilty of usurping a business opportunity of appellant either in purchasing the option on the Hetzler Industrial Park property or in purchasing an automobile shredder from Hammermills, Inc. As to the latter, Maryland Metals was perfectly free to purchase an identical model either before or after appellees consummated the purchase, as appellees had urged, and was therefore not deprived of any opportunity to obtain a shredder. With respect to the option property, it need only be said that appellant deliberately let its previous option on the same site expire some four years before appellees acquired their interest without making any attempt to preserve a right

to the location. In light of appellees' continual exhortations to enter the shredding business, appellant's procrastination and intransigence amounted to no less than an abandonment of whatever corporate opportunity might have existed in regard to the option property. *See Diedrick v. Helm,* 217 Minn. 483, 14 N.W.2d 913, 920, 153 A.L.R. 649 (1944); Note, 74 Harv. L. Rev. 765, 774-75 (1961).

Reduced to its essence, then, appellant's claim is that Metzner and Sellers violated their fiduciary duties by concealing the details of their preparatory activities aimed at setting up a competitive business in the future. Despite appellant's strenuous protestations, the conduct complained of is precisely what the law permits. In support of its argument, appellant points to a statement in *C-E-I-R, Inc. v. Computer Corp.,* 229 Md. at 367, where we indicated in dicta that "an agent is under a duty to disclose to his employer any information which the employer would be likely to want to know." Since appellant states predictably that it would have certainly wanted to be apprised of the specifics of appellees' preliminary arrangements, it claims that appellees were obliged to divulge this information.

Our answer to appellant's argument is twofold. First, as we ourselves emphasized in *C-E-I-R, Inc. v. Computer Corp.,* 229 Md. at 367, it is not necessary "that in all cases an employee ... tell his employer of his future plans to become a competitor." *Accord, Cudahy v. American Laboratories, Inc.,* 313 F. Supp. at 1346. More importantly, appellant fails to recognize that an employee's privilege to plan and prepare for future competition while in the employ of a prospective competitor would be rendered practically meaningless if the employee were required by law to reveal the details of such arrangements. *National Rejectors, Inc. v. Trieman,* 409 S.W.2d 1, 26-27 (Mo. 1966). Holding employees to a continuing obligation, prior to severing their employment, to divulge in detail the full extent of their preparatory arrangements to compete, as appellant suggests, would, in our opinion, constitute an unjustifiable infringement upon the individual's right to select his employment and would create an

undesirable impediment to free competition in the commercial and industrial sectors of our economy.

In light of his factual findings, the chancellor, in our opinion, was entirely correct in dismissing appellant's amended bill of complaint. We hold that appellees' conduct here falls within the mere preparation privilege accorded employees contemplating termination of employment. Looking beyond the mere failure to disclose the details of their preparations, we have been unable to find in the record any evidence of such unfair, fraudulent or wrongful conduct on the part of appellees as would entitle appellant to relief in the form of an injunction, damages or an accounting for profits. Both Metzner and Sellers served appellant diligently for twenty-three and four years, respectively, comporting themselves with the utmost good faith and fidelity. Their foresighted suggestions that appellant expand into the shredder business were intended to benefit the company, not harm it. Indeed, appellees offered Maryland Metals the chance to participate in the proposed venture up to the very time of their departure. Had appellant heeded its employees' suggestions or had it previously exacted from them a covenant not to compete, it might have avoided its present dilemma. Unfortunately for appellant, it pursued neither of these options and cannot now be heard to complain.

### III

Appellant's final assignment of error concerns a ruling of the chancellor permitting appellees to read certain portions of their pre-trial deposition testimony into evidence. As part of its case in chief, appellant read selected passages from the depositions of Metzner and Sellers, as permitted under Maryland Rule 413 a 2, which provides that the "deposition of a party ... may be used by an adverse party for any purpose." The chancellor thereupon granted appellees' request to read those portions of the depositions which had been omitted by appellant in the course of its presentation. Appellant objected, claiming that the trial court was obliged to require appellees to demonstrate that the parts of the deposition testimony they sought to read satisfied the

"fairness" standard set out in Rule 413 a 4, which reads in its entirety:

> "If only part of a deposition is offered in evidence by a party, an adverse party may require him to introduce any other part which ought in *fairness* to be considered with the part introduced, and any party may introduce any other parts in accordance with this Rule." (emphasis added).

*See also Bauman v. Woodfield,* 244 Md. 207, 221, 223 A. 2d 364 (1966).

The short answer to appellant's argument is that Rule 413 a 4, like its counterparts in federal practice, Rule 32(a)(4) of the Federal Rules of Civil Procedure and Rule 106 of the Federal Rules of Evidence, endows the trial judge with broad discretion in determining when and how much of a deposition may be admitted in evidence after part of the deposition has already been introduced by an adverse party. It is entirely up to the trial judge to assess in each case the need to rectify any misleading impression created by an incomplete reading of deposition testimony and to devise an appropriate remedy within the confines of the rule. *See* 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 106 [01], at p. 106-07 (1977). The latitude accorded trial judges is even greater in non-jury cases, like the present matter, where the risk of prejudice to the parties is diminished.

In the instant case it is apparent from the record that the chancellor was persuaded that the fairness of the inquiry would be best promoted by allowing appellees to read the proffered portions of their pretrial depositions. We cannot say that the chancellor exceeded or abused in any way his discretion in permitting appellees to supplement appellant's selective presentation of Metzner and Seller's deposition testimony. *See Williams v. Moran,* 248 Md. 279, 291, 236 A. 2d 274 (1967) (discretion of trial judge in applying discovery rules will not be disturbed in the absence of a showing of abuse).

> *Order dismissing bill of complaint*
> *affirmed; appellant to pay costs.*