# CIRCUIT COURT OF FAIRFAX COUNTY

Scientific Enterprises,
Inc., et al.

v.

Donald C. George et al.

April 2, 1998

Case No. (Chancery) 132066

BY JUDGE M. LANGHORNE KEITH

This matter came on for a hearing on September 8, 1997, and was heard for five days concluding on September 15, 1997. Post-trial briefing was completed on October 10, 1997. Complainants' Bill of Complaint alleges that Respondents conspired to injure Complainants in their trade or business, breached their fiduciary duties to Complainants, and converted to their own use and benefit Complainants' property. In their counterclaim, Respondents seek payment of back salary, expenses, and unpaid, deferred, and accrued compensation. The counterclaim for deferred compensation was struck at the conclusion of the evidence.

*Findings of Fact*

Complainants, Scientific Enterprises, Inc. ("SEI"), Sci-Rep, Inc. ("Scirep"), Sci-Tek, Inc. ("Scitek"), and Scientific Associates, Inc., are related Virginia corporations. Respondents, Donald C. George and Dennis McFadden are individuals who own and operate Respondent, Technical Representatives, Inc., a Pennsylvania corporation ("TRI"). George and McFadden were

minority shareholders of SEI and officers and directors of all of the Complainants. Richard Keyes, not a party to this action, is the majority shareholder of SEI.

In 1976 Keyes hired McFadden and George as sales engineers to work for SEI. Before their employment with SEI, McFadden had been the sales manager for a major client of SEI, Keithley Instruments, Inc. ("Keithley"), and George worked for McFadden. In the early years of SEI's operation, Keyes was apparently a prime mover in the company, but by May of 1993, McFadden and George were dissatisfied with the situation at SEI. Keyes had taken some of their territory, was spending most of his time on administrative matters, not sales, and while a good part of SEI's business could be traced to McFadden's and George's contracts and efforts,[1] Keyes and his wife,[2] nonetheless, were drawing substantial sums from the company. In addition, McFadden and George lost promised deferred compensation because of a settlement with a former shareholder/employee of SEI.

Efforts to resolve this business dispute with Keyes were not successful, and by May of 1993, McFadden and George had consulted counsel for advice concerning their resignation from SEI and setting up their own company. On October 1, 1993, McFadden and George resigned as employees, officers, and directors of SEI and the other Complainants. According to a stock repurchase agreement dated October 1, 1977, they tendered their shares of stock in SEI. After their resignation, McFadden and George offered positions in TRI to Keith Black and Betty Taylor. There is some circumstantial evidence that an offer to join TRI was made to Walter Bryson before October 1, 1993, but after considering all the evidence and the testimony of the witnesses at trial, the Court concludes that the Complainants have failed to show that TRI's offer predated McFadden's and George's resignation. Bryson, Black, and Taylor all accepted the offers and joined TRI within a few days after October 1, 1993.

While Complainants assert that McFadden and George solicited SEI clients before they resigned on October 1, 1993, the evidence does not support this claim. Shortly after their resignation, McFadden and George sent fax messages to their former SEI principals informing them that they had left SEI, formed TRI, and solicited a shift of accounts from SEI to TRI. Officers from Keithley, IOtech, Lake Shore, and Cincinnati Sub-Zero Products all testified

---

[1]  IOtech, Inc., and Lake Shore Cryotronics, Inc., the other major clients of SEI, were brought in as a result of SEI's relationship with Keithley which, in turn, had a "special relationship" with McFadden and George. In this letter opinion, the term "SEI" is used as a collective term of Scitek and Scirep as well as SEI.

[2]  Mrs. Keyes enjoyed a $30,000.00 salary as a part-time bookkeeper for SEI.

that they knew nothing of McFadden's and George's plans before October 1, 1993. Each of these client-companies gave Keyes an opportunity to keep their business for SEI after McFadden and George left. Keyes hired two salesmen to replace McFadden and George. Keyes efforts were unavailing, and TRI was successful in having these and other principals shift their sales representative business to TRI. When George called Keithley, he told the sales manager, Mr. Brock, that Bryson and Black were on board at TRI. This representation was not true when made, but it was true by the time Mr. Brock decided to terminate SEI.[3] The evidence was in conflict concerning whether McFadden and George harbored any malice or ill will toward SEI. The Court finds, after considering all the testimony and other evidence, that no such feelings motivated McFadden and George.

In 1990, McFadden was under some financial pressure and set up a company known as Tech-Pro that received $16,154.18 worth of commissions that admittedly should have gone to SEI. George did not know that McFadden had set up Tech-Pro until McFadden proposed to use this corporation in the Spring of 1993 when he and George began to plan their departure from SEI.

During the time that McFadden and George were planning to leave SEI and set up their own sales company, they were not as scrupulous as they should have been in making sure they did not use SEI resources to advance their own plans. Phone bills, dinners, and motel rooms were charged to SEI that were attributable to TRI not SEI. Because the evidence indicated that their working hours were so flexible, the Court does not find that McFadden and George planned their move on SEI's time.

The most serious charge leveled by SEI is that McFadden and George converted SEI customer lists. Respondents argue that these lists were not confidential and that most of the information in them came from the principals of SEI. They further argue that the information in the lists is readily available. However, Respondents concede that they would not turn over their own customer lists to a competitor. There seems little doubt to the Court that some of the customer lists were taken by McFadden and George when they left SEI. However, they did not deprive SEI of the lists as copies were left behind when Respondents departed. Further, it is unclear what, if any, damages SEI suffered because TRI had the lists available or even what the value of the lists was. The information in the customer lists was not confidential, and the main value of the lists was the cost of compiling them. There was no evidence that the

---

[3]   Keithley took the position that under its agreements with SEI, it could terminate SEI on thirty days' notice. During this thirty-day period, Keithley made commission payments to SEI although TRI was its sales representative.

customer lists were useful in TRI's efforts to convert principals from SEI to TRI. The Court finds that the principals left SEI not because TRI had copies of SEI customer lists but because McFadden and George were no longer with SEI. While Keyes may have been a key salesperson in the early years of SEI's operations, by 1993 McFadden and George were indispensable to the continued success of SEI with Keithley and SEI's other principals. The failure of Keyes to recognize this perhaps unpleasant fact and to nurture McFadden and George was the shoal upon which SEI grounded.

On October 1, 1977, McFadden signed an individual employment agreement with Scientific Representatives, Inc., that stated it incorporated by reference a "Company Employment Policy attached hereto … ." Complainants' Exhibit 4. The undated Company Employment Policy of Scientific Enterprises, Inc., was introduced as Complainants' Exhibit 3[4] but was not attached to Exhibit 4. The Company Employment Policy required that an employee give sixty days' notice of the termination of employment. Complainants' Exhibit 3, Paragraph 13. On September 4, 1990, Scientific Representative, Inc.'s corporate existence was terminated by the State Corporation Commission, and there was no evidence that McFadden ever signed another employment agreement. However, the October 1, 1977, minutes of the combined meeting of stockholders and Boards of Directors of Scientific Enterprises, Inc., Sci-Rep, Inc., Scientific Representatives, Inc., and Scientific Associates, Inc., stated that the Company Employment Policy of Scientific Enterprises, Inc., "was adopted as the Company Employment Policy for Scientific Enterprises, Inc., Sci-Rep, Inc., Scientific Representatives, Inc., and Scientific Associates, Inc." Complainants' Exhibit 1 at p. 5. McFadden and George signed these minutes as shareholders and/or officers of the Complainants. George signed an individual employment agreement with Scientific Associates, Inc, on October 1, 1977, that incorporated the Company Employment Policy. Complainants' Exhibit 7. Neither the employment agreements nor the Company Employment Policy contained covenants not to compete.

A combined meeting of the stockholders and Boards of Directors of Scientific Enterprises, Inc., Sci-Rep, Inc., Sci-Tek, Inc., Scientific Associates, Inc., and Scientific Trading, Inc., was held on March 23, 1993. Complainants'

---

[4]    Paragraph 1 of the policy stated that it "shall apply to all professional employees of Employer, whether employed directly by Employer, or by any of Employer's subsidiaries, whether wholly-owned by Employer or controlled by Employer." Exhibit 3, the Company Employment Policy, was not signed by either McFadden or George.

Exhibit 64. McFadden and George were elected as officers of all these corporations except for Scientific Trading, Inc. In addition, McFadden and George released all claims for deferred compensation from the subject companies. On October 5, 1993, Complainants accepted the resignations of McFadden and George. Respondents' Exhibit 21.

The evidence concerning unpaid salaries for the month of September was inconclusive. McFadden earned $8,539.00 in commissions for pre-October 1, 1993, billings, and George earned $11,608.00 for the same period. George's unpaid expenses for August and September were $1,653.00, and McFadden's unpaid expenses for August were $1,473.35.

## Conclusions of Law

The Bill of Complaint contains three theories of recovery against Respondents. These will be dealt with below as will Respondents' counterclaims.

### A. *The Conspiracy Claim*

In order to prove a conspiracy under Va. Code Ann. §§ 18.2-499 to 18.2-500, Complainants must show that Respondents combined for the purpose of willfully and maliciously injuring Complainants in their trade or business. *Commercial Business Systems v. BellSouth Services, Inc.*, 249 Va. 39, 47 (1995). Only legal malice is required, that is the Respondents must have acted intentionally, purposely, and without lawful justification. *Id.* As the Court has found that McFadden and George did not combine for the purpose of injuring the Complainants, this count must fail. Moreover, it is not unlawful for employees to decide together to leave their employment and then attempt to take or take their former clients with them. *Peace v. Conway*, 246 Va. 278 (1993); *Restatement (Second) of Agency* § 396 (1958). The Supreme Court of Virginia has noted that:

> it is not unusual in the business world for an employee to leave his employment and start a competing business. When this occurs, inevitably customers of the former employer will desire to continue to deal with the former employee in the new business. Therefore, had [the former employer] desired to prevent [his employees] from soliciting his customers, he could have required his employees to execute covenants not to compete.

*Peace v. Conway, supra* at 282.

Here, the evidence shows that all solicitations of SEI's principals took place after McFadden and George resigned. Because the evidence does not support Complainants' allegations that Respondents purposefully sought to injure SEI, and no unlawful conduct took place, I find in favor of the Respondents on the Conspiracy Count.

## B. *The Breach of Fiduciary Duty Claim*

Despite Keyes' dominant role in the management of the Complainant corporations, there can be no doubt that McFadden and George were officers and directors of these corporations and owed them a fiduciary duty. *Glass v. Glass*, 228 Va. 39, 47 (1984). This duty includes the obligation that officers and directors not compete with their employer while they remain on the employer's payroll. But, this duty ceases once the relationship is terminated. *Hilb, Rogal and Hamilton Co. v. DePew*, 247 Va. 240 (1994). The question in this case is whether employees can plan to form a new and competing company while they are still employees of the company to which they owe a duty of utmost loyalty. There is no Virginia case directly on point on this issue.

Complainants cite *Steelvest, Inc. v. Scansteel Service Ctr.*, 806 S.W.2d 476 (Ky. 1991), for the proposition that no such activity is consistent with the duty of utmost loyalty.

Respondents counter with *Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 382 A.2d 564 (1978), which holds that the policy in favor of free competition enables employees to prepare or make arrangements to compete with their employers without fear of violating their fiduciary duty of loyalty. The *Maryland Metals* court further held that this right was far from absolute and that certain pre-termination activities could rise to the level of a breach.

I believe that the Virginia Supreme Court, having recognized "the rough and tumble world comprising the competitive marketplace," *Commercial Business Systems, supra*, at 294, would favor the approach of *Maryland Metals* over that of *Steelvest*. Further, having reviewed all the evidence and weighed the credibility of the witnesses, I do not find that the activities of Messrs. McFadden and George crossed the line drawn by the Court of Appeals of Maryland. I agree with the Respondents that their failure to give sixty days' notice, if it was required,[5] does not rise to a breach of fiduciary duty. I find for

---

[5] SEI accepted the McFadden and George resignations on October 5, 1993, without reservation.

the Respondents on the Breach of Fiduciary Duty Count. Because of this finding, the prayer for a constructive trust is unavailing.

## C. *The Conversion Count*

After reviewing all the evidence, I find that McFadden and George did convert some SEI property to their own use without permission or justification. There can be no question that McFadden converted $16,154.18 of SEI commissions to his own use. The value of the other property converted is more difficult to ascertain, and Complainants have done little to assist the Court in making a determination of the actual value of the customer lists, telephone calls, dinners, and motel rooms that McFadden and George improperly charged to SEI. Nonetheless, I find in favor of the Complainants on the Conversion Count and assess damages as follows:

| | |
|---|---|
| Mr. McFadden individually: | $16,154.18 |
| Messrs. McFadden, George, and TRI, jointly and severally: | $ 7,500.00 |

## D. *The Counterclaims*

As the findings of fact above indicate, McFadden and George are owed commission and salary as follows: McFadden: $8,539.00 in salary and $1,473.35 in expenses; George: $11,608.00 in salary and $1,653.00 in expenses. I find in favor of the Respondents in these amounts.