**INLAND RUBBER CORPORATION,**
Plaintiff,

v.

**TRIPLE A TIRE SERVICE, INC., Triple A Tire Service of N. Y., Inc., Philmore Finkelstein, Irving Nissenberg and Charles Katz, Defendants.**

United States District Court
S. D. New York.
Nov. 14, 1962.

Seligson, Morris & Neuburger, New York City, for plaintiff; David Sive, and Frederick M. Mintz, New York City, of counsel.

Hays, Sklar & Herzberg, New York City, for defendants; Howard A. Heffron, New York City, of counsel.

TYLER, District Judge.

In 1948 Harold Leitman organized Fleet Tire Mart as a partnership bearing the name of "The Tire Mart", to engage in the business of selling, primarily by telephone, truck tires. In 1950 the firm was incorporated as Tire Mart, Inc. In 1958 all of the capital stock was purchased from Leitman and members of his family by the Vanderbilt Tire & Rubber Corp. of which Mr. Leitman became president. On January 1, 1962 the name of this corporation was changed to VTR, Inc.

On or about April 1, 1962, all of the assets of the Fleet Tire Mart were sold

to plaintiff, Inland Rubber Corporation (hereafter "Inland"), an Ohio corporation doing business in New York. Mr. Leitman is not presently employed by the plaintiff. The agreements of sale and purchase of the assets and business of Fleet Tire Mart, between VTR, Inc. and plaintiff, however, do give VTR an interest in the receipts of Inland from sales of tires by the Fleet Tire Mart operation. As president of VTR, Inc. Mr. Leitman also renders frequent advisory and consultive services to Inland with respect to the Fleet Tire Mart operation.

Inland operates through two divisions: a "Dealer Division" and a "Direct Sales Division". The Direct Sales Division is the Fleet Tire Mart operation, which is the phase of Inland's business involved in this dispute.

The Fleet Tire Mart, since its inception and continuing to date, has developed the following procedures in securing its customers.

Fleet Tire Mart obtains "raw lists" of truck operators, and other concerns which maintain trucks, either by buying them outright or by renting them. The purchased lists are "screened" by Inland in order to winnow out four categories: [1] (1) those who have the capacity and authority to buy truck tires; (2) those who do not have any particular relationship with a major manufacturer or distributor; (3) those who will buy non-nationally advertised brands of tires; (4) those who have made no purchases from Fleet Tire Mart previously.

After the purchase or rental of a list, Fleet Tire Mart organizes and conducts a direct mail campaign. The average rate of response to this is no more than 2%. Responses are turned over to its salesmen. Sales are made by specially trained salesmen who have detailed technical knowledge of the particular needs of the buyers whom they solicit for sales by telephone all over the United States. Salesmen succeed in making sales to approximately 47% of the customers they telephone. Persons who order or indicate they wish to order are further screened by the credit department of Fleet Tire Mart; poor credit risks are excluded.

For each of its accounts and customers, Fleet Tire Mart keeps a confidential numbered file. In each file is kept the complete history of the transactions and dealings between the customer and the plaintiff. The file includes correspondence, credit information, salemen's memoranda, copies of orders, contracts and invoices and records of payment.

It is stated that this screening process represents the work of fourteen years of the Fleet Tire Mart operation. As a matter of costing its screening operation, Fleet Tire Mart estimates an approximate cost of $50 for winnowing out each prospective customer to be approached by one of its salesmen.

Inland, through its principals and Mr. Leitman, states that its customers and the separate file for each, comprise the most valuable asset of Fleet Tire Mart, and that plaintiff paid $1,750,000 for the assets in April of this year.

Individual defendants Finkelstein, Nissenberg and Katz for a number of years until this past October 2 were salesmen of Fleet Tire Mart. It is alleged that there was a "long history of dissatisfaction" on the part of the individual defendants with the terms and conditions of their employment in the Fleet Tire Mart operation. Casting about for other employment opportunities in September, 1962, they communicated, through Mr. Finkelstein, with a Florida based competitor of plaintiff, Triple A Tire Service, Inc. (hereafter "Triple A of Florida"). On September 28, 1962, the other corporate defendant, Triple A Tire Service of N. Y., Inc. (hereafter "Triple A of New York"), was organized as a subsidiary of Triple

---

[1] When the lists are rented no screening process can be carried out since the plaintiff never gets possession of the list. Matter is mailed for the lessee, by the lessor himself, to the listed addresses.

A of Florida, with arrangements that the three men would share in any profits and receive salaries as salesmen-employees.

These arrangements were effected without any knowledge of or notice to plaintiff. On the morning of October 2, 1962, all three individual defendants suddenly and without prior notice quit their employment with Fleet Tire Mart and promptly started sales operations on behalf of Triple A of New York.

On October 23, 1962, Inland commenced this equity action seeking compensatory and punitive damages, together with an injunction against certain allegedly unfair competitive actions of defendants. At the same time, Inland moved for an injunction *pendente lite.*

Resuming the narrative of the events underlying this controversy, it appears that in September, 1961, Mr. Leitman and certain principals of plaintiff had been concerned about what appeared to them to be evidence of leakage of confidential business information of Inland to Triple A of Florida. Motivated, at least in part, by this concern, they asked the three individual defendants and other employees to sign agreements or "covenants", as follows:

"In consideration of my employment hereafter by Vanderbilt Tire & Rubber Corporation ("Company"), or any of its subsidiaries, I hereby agree at all times to conduct myself in such manner as to reflect credit upon the Company and not to engage without the consent of the Board of Directors in any activities which might adversely affect its business. I further agree that I will not at any time while employed by the Company or thereafter voluntarily reveal or make known to anyone any confidential information (including but not limited to price information and customer lists) received by me during the course of my employment with regard to the Company, its business, or anything connected therewith,

and all such information shall be kept confidential.

"I hereby acknowledge that I have this day received a copy of this agreement.

(Signed)

_____
(Employee's Signature)"

Three copies of this agreement, each purporting to bear the signature of one of the individual defendants, were submitted by plaintiff on this motion.

The individual defendants do not categorically deny that they executed these covenants; however, they state in their affidavits that they cannot specifically recall having signed them. In any event, their principal position with respect to the covenants is that, as a matter of law, they are unenforceable by Inland since they were made to a corporate predecessor of Inland without consent, contemporaneous or subsequent, by the individual defendants to an assignment thereof.

Inland's principals further assert in their affidavits that some complete customer files, some copies of orders (blue sheets), copies of invoices (pink sheets), and a copy of the entire list of names and addresses to whom the most recent direct mail piece was sent by Inland, are missing.

Plaintiff contends that Finkelstein, Nissenberg and Katz took the above items and are soliciting accounts of the plaintiff. This is denied by the defendants. Plaintiff also alleges that the defendants actually made sales while in the employ of Inland and filled these orders while in the employ of Triple A of New York. This also is denied by the defendants.

Mr. Leitman of VTR, Inc. deposes that he and his brother, Donald, visited the offices of Triple A of New York on October 18, 1962, where they recognized copies of invoices which bore the Fleet Tire Mart name and were the type of invoice used by the plaintiff. Leitman also saw copies of Dun & Bradstreet reports on accounts and customers of the plain-

tiff bearing dates prior to October 2, 1962. Defendants generally deny this.

Finkelstein, Nissenberg and Katz, however, do admit that they took with them to Triple A of New York their personal notebooks kept by them over the years with the names and addresses of Fleet Tire Mart customers to whom they had made sales. They admit taking with them Inland "pink sheets" which were the saleman's copies of orders on which commissions were payable. From these "pink sheets", they made index cards and then threw the "pink sheets" away. Prior to the restraining order issued by Judge Murphy herein on October 23, 1962, they made various calls to customers from these cards.

They assert, however, that they are able to recall a large number of names from memory and that, with the aid of a Dun & Bradstreet reference book, they are in a position to reconstruct a major part of the Inland customer lists or files. They also argue that salesmen had no formal, complete contract of employment with Inland and were not specifically advised that Inland files were confidential. Defendant Finkelstein claims that the plaintiff does not give technical training relating to the selling of tires and that customers were obtained as a result of the personal qualities of the salesmen and not as a result of the aforementioned Fleet Tire Mart "screening" operation.

Diversity jurisdiction obtains in this action, and, as the parties apparently agree, the applicable substantive law is that of New York.

■ The law of New York forbids an employee, after leaving the service of a given employer, unfairly to exploit for his own benefit "trade secrets" or other confidential information known to such employee by virtue of the employment. (See authorities discussed infra.) A crucial point, of course, in any case where this principle is sought to be invoked is whether the particular information involved is such confidential information or "trade secret" material as to fall within this rule.

■ As regards the facts of this case, "The scope of confidential knowledge embraced within the general term of reference of trade secrets applies to customer lists and contacts, where the nature of the business demands a considerable effort in building up patronage". Cupid Diaper Service v. Adelman, 27 Misc.2d 1095, 211 N.Y.S.2d 813, 814 (1961).

■ While recognizing the general validity of such a rule, some New York courts have appeared to add the requirement that the customers included in such a protected list must not be publicly known or advertised as potential customers. Thus,' in denying injunctive relief to a plaintiff which sought to bar a former employee from soliciting its customers, the Appellate Division in one case stated, "The establishments served carried on their businesses openly, notoriously, and publicly, and the names and addresses of such customers were readily ascertainable from the public directory or from a mere inspection by passers-by." Levy v. Cosmos, 221 App. Div. 533, 224 N.Y.S. 486, 490 (1st Dept. 1927). See also, S. W. Scott & Co., Inc. v. Scott, 186 A.D. 518, 174 N.Y.S. 583 (1st Dept. 1919).

In the case at bar, virtually all of plaintiff's customers do business publicly and from advertised locations somewhere or in some locale in the United States. Presumably, their names, addresses and, in some instances, at least, a general description of the type of business they conduct is information available from telephone directories, and credit reference directories and trade publications or lists.

But, as I read the better reasoned cases, these facts do not of themselves take the identity of the customers and related information involved herein out of the class of protected confidential information.

In a recent important case in this area, Town & Country House & Home Service, Inc. v. Newbury, 3 N.Y.2d 554, 558, 170 N.Y.S.2d 328, 331, 147 N.E. 2d.724, 726, (1958), the New York Court

of Appeals, affirming an order of injunction, stated that former employees "* * * may not solicit * * * customers who are not openly engaged in business in advertised locations *or* whose availability as patrons cannot readily be ascertained but 'whose trade and patronage have been secured by years of business effort and advertising, and the expenditure of time and money, constituting a part of the good will of a business which enterprise and foresight have built up' [emphasis added] (Witkop & Holmes Co. v. Boyce, 61 Misc. 126, 131, 112 N.Y.S. 874, 878, affirmed 131 App.Div. 922, 115 N.Y.S. 1150, followed in People's Coat, Apron & Towel Supply Co. v. Light, 171 App.Div. 671, 673, 157 N.Y.S. 15, 16, affirmed 224 N.Y. 727, 121 N.E. 886)."

The italicized word "or" in the above-quoted passage manifests the intention of the Court of Appeals that the fact that customers are publicly advertised does not render their identity non-confidential information, as long as there is the requisite expenditure of time and money in locating and obtaining the patronage of such customers.

This conclusion does not rest alone on a verbalistic construction of the court's language.

What is sought to be protected against in these cases is an essentially unfair exploitation by a former employee of the assets, including trade secrets or other important information, developed by the former employer. The element of unfairness lies chiefly in the expropriation of assets, such as information, which cost the former employer much time and money to develop. In view of this, the availability of names of customers in various directories can have significance only as it bears on the relative ease or difficulty of securing the patronage of those customers. This, in my view, is the clear meaning of the above-quoted passage from the opinion of the Court of Appeals in Town & Country.

The controlling question, therefore, is whether the identity of plaintiff's customers herein represents such an investment of time and money on the part of plaintiff that the rule of law reiterated in Town & Country forbids the defendants here to turn such information to their own use. I find that it does.

The Fleet Tire Mart operation acquires most of its customers by means of a significant screening process, described in some detail above. The customers disclosed by such process are special or "unique", in being willing to purchase, by telephone, a brand of tires not nationally advertised. The identification of a substantial number of such customers represents a cognizable investment of time, effort and money.

I conclude that the identity of the customers involved here is confidential, protected information in the meaning of the New York cases. This conclusion is supported by two additional considerations.

An alternate, or supplementary, basis for the injunctive relief sought by plaintiff is afforded by the negative covenant alleged[2] to have been ascribed to by defendants (see p. 882, supra).

Whereas it might be said that such covenants add nothing to the general common law restrictions on the conduct of a former employee, there is a recurrence of language in the cases, where such covenants are *absent*, to the effect that had such covenants been present, plaintiff's position therein would be strengthened. Eg., Apollo Stationery Co. v. Pilmar, 15 Misc.2d 91, 182 N.Y.S. 2d 637, 640 (1958), affd. 9 A.D.2d 649, 192 N.Y.S.2d 475, (1st Dept.1959); see also, Bates Chevrolet Corp. v. Haven Chevrolet, Inc., 13 A.D.2d 27, 213 N.Y.S. 2d 577, 580 (1st Dept. 1961) ("* * * Such interests will be preserved *even*

2. The individual defendants state by affidavit that they do not recall having signed such a covenant. While this falls far short of an assertion by the defendants that they in fact did not sign such documents, it may presage such a defense at trial, which, I assume for present purposes, the defendants are entitled to raise at a plenary trial.

[emphasis added] in the absence of negative convenants in employment contracts * * *").

However, defendants here, citing Avenue Z Wet Wash Laundry Co., Inc. v. Yarmush, 129 Misc. 427, 221 N.Y.S. 506 (1927), affd., 220 App.Div. 740, 221 N.Y.S. 788 (2d Dept. 1927); and Seligman & Latz, Inc. v. Noonan, 201 Misc. 96, 104 N.Y.S.2d 35 (1951), argue that plaintiff is not entitled to enforce these covenants since plaintiff is the assignee of the original contracting party, Vanderbilt Tire & Rubber Co., and that rights arising from such covenants are not assignable without the express consent, here absent, of the signing employee.

But more recent authority holds that such covenants are assignable without explicit consent of the contracting employee where such assignability under all the circumstances was intended by the parties. Abalene Pest Control Service, Inc. v. Powell, 8 A.D.2d 734, 187 N.Y.S.2d 381, 383 (2d Dept. 1959). Such an issue of intent cannot and need not be decided on the record now before the court. It may be noted, however, that the several factors, discussed herein, which demonstrate the value of the customer lists to Inland, may be evidentiary of an intent to make these covenants an integral and transferable part of the assets of the Fleet Tire Mart operation.

Moreover, the specific inclusion of "customer lists" in the information protected by the covenant is, whatever the trial court may determine the legal effect of these covenants to be, some evidence now of the confidential and important nature of such information.

In view of the foregoing, the presence in the case at bar of these covenants substantially increases the probability of plaintiff's ultimate success in a plenary trial on the merits.

A third consideration, arising from the facts of this case, reinforces this probability.

The New York courts have, in this type of case, given consideration to the equities arising from the nature of the defendant employee's conduct in leaving plaintiff's employ and setting up on his own. For example, in S. W. Scott & Co., Inc. v. Scott, supra, p. 526, 174 N.Y.S. 583, the court, although denying injunctive relief therein, noted in passing that its holding might have been otherwise had there been a showing that defendants had conspired to go into business to deprive plaintiff of its customers and deceived some customers by representing after leaving plaintiff's employ, that they were still with plaintiff company.

The record before the court here indicates the presence of several such equitable factors militating in favor of granting the preliminary injunction sought by Inland.

One such factor is that defendant Finkelstein admits that while still in the employ of plaintiff company, he initiated and conducted, with the knowledge and acquiescence of defendants Katz and Nissenberg, negotiations with defendant company, Triple A of Florida, to the end of setting up Triple A of New York in which one or more of the individual defendants were to be principals. While such negotiations looking to post employment activity need not in themselves be reprehensible, their potential inconsistency with loyalty to the employer is a factor to be weighed with others in a case involving the competitive activity of a former employee. See, Duane Jones Co. v. Burke, 306 N.Y. 172, 117 N.E.2d 237 (1954).

Another factor of similar import is that the defendants here, on leaving Inland, took with them certain records containing information on the customers of plaintiff company. There is a substantial dispute as to just what was in fact taken, but the defendants do admit to having taken material.

A third such factor is presented by allegations that one or more of the defendants, after leaving plaintiff's employ, filled orders which they had obtained on

behalf of plaintiff in September, 1962, with tires sold by defendant company.[3]

In addition to a strong probability that plaintiff will prevail in a trial on the merits, there is also present a threat of irreparable injury to plaintiff, should its motion for preliminary injunction be denied and defendants allowed to solicit its customers pending resolution of the dispute by a trial on the merits.

The value of these customer lists is placed in jeopardy by a competitor having, to a substantial degree, equal access to them. Such access destroys the very competitive advantage which was sought and achieved by the expenditure of time and money that has gone into them.

Finally, in balancing the equities of the parties, it must be noted that an injunction, which this court concludes should issue, will leave defendants free to fairly conduct the business of selling tires by telephone. As stated by defendant Finkelstein in his affidavit of November 2, 1962:

"Plaintiff admits that its customers are but a slight percentage of the total number of potential tire purchasers in the United States. Therefor, whatever the disposition of plaintiff's motion, there will be thousands of potential purchasers with whom we should be free to deal."

The defendants are free to exploit this market in the same manner as did plaintiff, and its predecessor in interest, Vanderbilt, in building the Fleet Tire Mart operation. What is proscribed by the injunction hereinafter particularly ordered is the use by defendants of their knowledge of the identity of plaintiff's customers.

Defendants argue, understandably, that notwithstanding the clarity of this general proscription, virtually insurmountable difficulties will acrrue from its specific implementation.

However, the problem, should it later arise, of determining whether the defendants have disobeyed this order, will be one of ascertaining whether defendants' solicitations, including, perhaps, solicitations of some of plaintiff's customers whose identities are set forth in independent sources, were merely part of an independent plan and program of building its business, or, on the other hand, represented substantial use, in contravention of the injunction issued herein, of defendants' knowledge of the identity of plaintiff's customers.

Plaintiff's motion for a preliminary injunction is granted, and, upon condition that plaintiff first give security in the sum of $25,000.00 for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained, such bond to be approved by this court or by the Clerk of this court, it is

Ordered that the defendants, Triple A Tire Service, Inc., Triple A Tire Service of N. Y., Inc., Philmore Finkelstein, Irving Nissenberg and Charles Katz, their officers, agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are hereby enjoined from:

(1) using or making known to any person, firm, or corporation the information specified in this subparagraph and obtained by the individual defendants herein by reason of their employment in the Fleet Tire Mart operation, presently conducted by the plaintiff and, prior to April 1, 1962 conducted by VTR, Inc. (known until January, 1962 as Vanderbilt Tire & Rubber Corporation); to wit: the names and addresses of customers, past and present, of the Fleet Tire Mart operation, and information relating to such customers derived from orders, invoices, credit reports or other similar documents issuing in the course of the business of Fleet Tire Mart;

(2) destroying or placing anywhere beyond recovery any papers, or physical

---

3. Affidavits of Lester, a customer of plaintiff, and Morris, an employee of plaintiff.

record of information taken therefrom, which are now in the possession or control of the defendants and were formerly in the files or otherwise under the control of plaintiff;

(3) converting any orders taken by the individual defendants on behalf of plaintiff while the said individual defendants were in the employ of plaintiff.

So ordered.