**PREFERRED ELECTRIC & WIRE CORP., and Replacement Parts Sales Corp., Plaintiffs,**

**v.**

**Harold KATZ, John Bucy, Dorothy Killaly, Joe Doe and Jane Roe, one through thirty-five, the names John Doe and Jane Roe being fictitious names, the names of said persons being not presently known, Excel Industries, Inc. and General Replacement Parts, Inc., Defendants.**

No. 77C 2504.

United States District Court, E. D. New York.

Nov. 28, 1978.

Lans, Feinberg & Cohen, Robert Stephan Cohen and Deborah, New York City, for plaintiffs.

Olwine, Connelly, Chase, O'Donnell & Weyher, Charles M. McCaghey and Joseph M. Burke, New York City, for defendants.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Plaintiffs, Preferred Electric & Wire Corp. ("Preferred") and Replacement Parts Sales Corp. ("Replacement"), commenced this action for damages in November of 1977 in the Kings County Supreme Court and it was thereafter removed by the defendants to this Court. Defendants then moved to dismiss the action for want of personal jurisdiction renoticing such motion for a hearing on February 17, 1978, and plaintiffs filed on February 9, 1978, an amended complaint seeking not only damages but also injunctive relief and on February 17, 1978 obtained an order to show cause from this Court, returnable March 1, 1978, containing a temporary restraining order which provided in pertinent part as follows:

"pending determination of plaintiffs' motion for a preliminary injunction, the defendants, their officers, agents, servants, employees, and all parties in active concert or participation with any of them, jointly and severally, hereby are enjoined and restrained from (a) utilizing in any manner plaintiffs' trade secrets including plaintiffs' customer lists and the information contained therein and depositing forthwith all such lists and other written information and all copies thereof with the Clerk of this Court, the same to be sealed; (c) advising plaintiffs' customers that plaintiffs have ceased to do business or have been taken over by any other company or commenting on or disparaging in any way plaintiffs' products and (d) advising plaintiffs' customers concerning the matters revealed in connection with the instant action; . . ."

By the order to show cause plaintiffs also moved for a preliminary injunction enjoining defendants from

"(a) utilizing in any manner plaintiffs' trade secrets including plaintiffs' customer lists and the information contained therein;

(b) contacting plaintiffs' customers concerning the sale to such customers of any product competitive with plaintiffs' product line;

(c) advising plaintiffs' customers that plaintiffs have ceased to do business or have been taken over by any

other company or communicating or disparaging in any way plaintiffs' products;

(d) advising plaintiffs' customers concerning the matters revealed in connection with the instant action; and

(e) granting such other and further relief as to the Court seems just and proper."

Plaintiffs argue that they are entitled to such relief because (i) defendants are in breach of contractual provisions containing restrictive covenants and (ii) regardless of such contractual provisions, defendants are in breach of fiduciary obligations owed as a matter of law to the plaintiffs.

Following considerable pretrial discovery on the foregoing issues of jurisdiction and plaintiffs entitlement to a preliminary injunction, the parties requested a hearing which was accorded to them by this Court on July 10, 11, 12 and thereafter they submitted excerpts from the pretrial depositions, affidavits, exhibits and memoranda in support of their respective positions.

The facts with respect to the issues involved herein are as follows:

Preferred is and has been for fifty years or more engaged in the sale of automotive, marine and snowmobile parts to small garages, general repair shops and transmission shops throughout the country. Replacement is a corporation which acts as the sales arm of Preferred. Both plaintiffs are fully owned by their President, John F. Poster, who purchased Preferred at the end of 1967 from the original owner who founded the same in 1919.

Prior to 1972 the plaintiffs sold their product through door-to-door "commission salesmen" and by that year the plaintiffs had achieved gross sales of approximately $1.2 million per year.

The door-to-door sales personnel (of whom the defendant Katz was one during the six-month period in 1971) prior to 1972, kept 5 × 8 customer cards on which they entered the name, the address, credit information, product information and personal information of plaintiffs' customers, were

assigned particular territorial regions in the United States and in those years were engaged primarily in the sale of electrical and rebuilder parts.

In the period since September, 1976, plaintiffs have also engaged in selling transmission parts and high energy ignition parts.

In December of 1971 the defendant Katz called Mr. Poster and advised him that he had been selling certain auto replacement parts for Windsor by use of the telephone and that he would like to set up a telephone sales operation for the plaintiffs using the Yellow Pages in the telephone books throughout the country. His proposal was that he would hire additional personnel whom he would manage and that plaintiffs would install and pay for all the telephone services (using their credit with the telephone company) and pay him commissions based on the net revenue from the sales made by Katz' personnel. In March 1972 Mr. Katz and one or two associates hired by him commenced selling for the plaintiff and by the end of that month they had achieved sales of approximately $6600 with telephone expenses amounting to approximately $2200. Mr. Poster complained to Mr. Katz of this ratio of expenses to sales who replied that such ratio was necessary at the outset of canvassing for sales and that the same would come down as new accounts were opened. In the beginning no pre-existing accounts of the plaintiffs were turned over to Mr. Katz and his organization and they were required to make solicitations to new customers found by use of the Yellow Pages in the various telephone books. In or about the early part of 1973, plaintiffs' road salesman for the Ohio territory, terminated his arrangements with the plaintiffs and his cards and territory were turned over to the Katz organization who were from the outset and from time instructed in sales methods and techniques by plaintiffs' general manager, Milton Steiner.

Such instruction or training in sales techniques was extensive and was given to the Katz' personnel beginning in 1972 and continuing thereafter as new salesmen were added by Mr. Katz to his organization.

By the winter of 1973 the sales attributable to the Katz organization had increased to approximately 22% of plaintiffs' business and Messrs. Poster and Katz agreed that they should reduce the arrangement between them to writing. Accordingly, an agreement was made in February 1973 which was shortly thereafter amended by a written agreement dated March 12, 1973, which provides in pertinent part [1] that:

"6. Harold Katz agrees that he will not, during the course of this agreement or for one year after termination, (no matter who causes the termination) disclose to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, any information that he receives as a result of his association with the company.

"7. Harold Katz agrees not to engage in the sale or marketing to any of Preferred's customers of any products sold by Preferred or competing therewith for a period of two years after date of termination of this contract.

"8. Harold Katz agrees that the information on documentation he receives is a valuable and unique asset and therefore all books, records, sales literature and other documents and records that come into Harold Katz's possession by virtue of the association are confidential and remain the property of the company and will be returned to the company promptly upon termination of this agreement.

"9. Harold Katz recognizes that a breach of the two previous provisions will result in irreparable harm to the company and in the event of a breach or threatened breach thereof Harold Katz agrees that the company is entitled to an injunction restraining Harold Katz from such breach of contract. Nothing herein shall prevent Preferred from pursuing any other remedy available to it."

The negotiations with respect to the written agreement between the parties took place both in New York and in New Jersey.

On March 12, 1973, Mr. Katz had enlarged his organization to include six sales-men and thereafter from time to time plaintiffs turned over additional areas and customer cards to Mr. Katz as their own salesmen terminated their particular arrangements with the plaintiffs. By 1977 plaintiffs had turned over approximately 2500 customers to the Katz organization and such organization accounted for approximately 90% of plaintiffs sales. Also by 1977, the Katz organization had increased to approximately thirty sales persons who were receiving from the plaintiffs through Mr. Katz sums aggregating approximately $26,000 per month. Moreover, it was understood between the plaintiffs and Mr. Katz that these individuals would devote their full time toward the sale of plaintiffs products and would not engage in any other sales activities. In such year plaintiffs were providing telephone services for each of the sales persons, including approximately 14 WATS lines at an approximate monthly cost to the plaintiffs of $17,000.

By reason of the increased sales generated by the Katz group Preferred was required to increase its warehouse space by approximately 50%, its investment in its inventory, its account receivables, a $105,000 computer, additional shelving for storage, materials for new product lines, and its office and warehouse staff, and was required to borrow up to approximately $350,000 to finance all of the foregoing. At the urging of the Katz group in 1976, the plaintiffs expanded their product line to include transmission parts and the Katz group, in turn, was increased by some six salesmen who had been selling transmission parts for other transmission suppliers but who had theretofore never sold any other automotive products.

In the fall of 1975 the plaintiff and Katz agreed that they should attempt to amend the written contract between them and there ensued an exchange of drafts of agreements, none of which however were ever signed.

1. See attached copy of entire agreement.

In the meanwhile and thereafter Preferred continued to turn over new territories given up by road salesmen, including Pennsylvania, Florida and Texas, to the Katz group and the parties continued to operate pursuant to the existing agreement.

In a letter dated November 24, 1976, addressed to Mr. Poster, Mr. Katz "resigned" stating that he would "no longer be managing the affairs of General Replacement Parts." [2]

Mr. Poster promptly arranged for a meeting with Mr. Katz during which they discussed the business of their respective organizations and at the end of which Mr. Katz withdrew his "resignation" and continued to operate his portion of the business as he had before.

In the spring of 1977, in connection with a further discussion with Mr. Poster of his portion of the business, Mr. Katz furnished to Mr. Poster an "organization chart" [3] which, as indicated above, by this time had assumed the trade name of "General Replacement Parts". [4]

In mid-August, 1977, Mr. Poster met with Mr. Katz at his office in Pennsylvania and complained to Mr. Katz with respect to the telephone expenses which were disproportionately high when compared to the new accounts then being produced.

Mr. Katz reassured Mr. Poster that such disproportionate ratio was temporary only and that sales and new accounts would increase substantially during the ensuing months. The contrary, however, happened. New account activity which had ranged between 415 to 463 customers during the months of June, July and August dropped sharply in September to 227, in October to 75, and in November to 44. In addition, Mr. Katz, with whom plaintiffs' employees had been in constant communication over the previous five years, became unavailable to the plaintiffs and plaintiffs' net sales dropped from $268,000 in August to $190,000 in November.

In the same period, the net sales generated by the Katz group for the defendant Excel Industries, Inc. ("Excel") increased from $12,000 in August to $114,000 in November.

In July or August, 1977, Mr. Katz called Mr. Peter Arenson, an officer of the defendant Excel Industries, Inc., and introduced himself as the Sales Manager of Preferred. Thereafter Mr. Katz called again indicating that he was interested in working for a new employer and Mr. Peter Arenson turned Mr. Katz over to his father, Mr. Rodney Arenson, President and 70% owner of the defendant Excel. The remaining shares of Excel were then held by Rodney Arenson's father who was retired.

Approximately ten days later Messrs. Katz, Rodney Arenson and five others met in Chicago where comparisons were made between the Arenson's and Preferred's operations, discussions were had with respect to Preferred's product line and customers and it was determined that Arenson's sales were weak in areas where Preferred was successful and that the Katz organization could be useful to the Arensons.

Mr. Rodney Arenson instructed his son, Mr. Peter Arenson, who is an attorney, to form GRP, Inc., using the name "General Replacement Parts, Inc." because the Katz organization had been selling under that name on behalf of Preferred "and the customers were used to that name". The purpose was to make an entry into Preferred's market; indeed Mr. Rodney Arenson stated that "GRP, Inc. was to be formed primarily to sell to the dealer, that is the automotive car dealer, and to the gas station and garage."

As bad as these facts are, the record gets considerably worse. After examining the affidavits and testimony of the Messrs.

2. See attached copy of letter.

3. See attached copy of the Organization Chart.

4. Indeed the proof showed that this name "General Replacement Parts"—had been used by the Katz group since 1975 and that from and after such time all checks from the plaintiffs to the group had been made payable to such trade name rather than to the name of Mr. Katz.

Katz, R. Arenson, P. Arenson, Killaly and Bucy and related exhibits, the Court is convinced not only that Mr. Katz and the Messrs. Arenson tried to mislead the Court into believing that (i) Mr. Katz made no sales of Excel products prior to November 21, 1977; (ii) sales people other than transmission sales people did not make sales of Excel products prior to said date and (iii) Preferred's telephones were not used in connection with sales of Excel's products prior to said date, but also they were in fact doing all of such things knowingly and covertly during the period from August through November 21, 1977.

Mr. Katz, for example, filed an affidavit sworn to January 6, 1978 (in support of defendants' motion for an order pursuant to FRCP Rule 12 dismissing the complaint on the grounds that this Court lacks personal jurisdiction over defendants) in which he averred that "[I] did not begin my sales efforts for G.R.P. until after November 21, 1977," that "neither [I] nor any of my sales people—other than the transmission sales people—had even discussed working for G.R.P. before November 21, 1977," and that "none of Preferred's telephones were ever used to sell [Excel] products" and "no sale has been obtained for G.R.P. at Preferred's expense on Preferred's lines."

Following three days of extensive questioning at a deposition taken by the attorneys for the plaintiffs on March 15, 16 and 17, 1978, Mr. Katz filed a "corrected" affidavit in which he admitted that he "made sales of [Excel's] products prior to November 21, 1977", that sales people other than the transmission sales people, also made sales of [Excel's] products prior to November 21, 1977, and that "Preferred's telephones were used at times in connection with sales of [Excel's] products."

Also in support of such motion twenty-two members of the Katz organization filed an affidavit stating that they had read the affidavit of Harold Katz sworn to January 6, 1978, and that "statements and facts set forth [therein] are true and correct to the best of our knowledge". Similarly, Mr. Rodney Arenson, in support of such motion, filed an affidavit sworn to January 6, 1978, stating inter alia, that "Excel has no connection with Harold Katz, John Bucy or any other of the individual defendants in this action. Excel has never done business with or through any of these individuals. Excel * * * has never sold any of its products through these individuals * * *. Excel simply has no relation whatsoever with any of these persons."

Under the circumstances, it is not surprising that at the conclusion of plaintiffs' case at the hearing held in July, defendants called no witnesses to the stand to rebut plaintiffs' case even though Messrs. Katz and Bucy and several of the sales persons of the Katz organization were apparently present during the hearing and the Messrs. Arenson and Mrs. Killaly were not shown to have been disabled or otherwise unavailable.

Apparently in an effort to minimize the extent of their misappropriation of plaintiffs' customers, defendants initially claimed that prior to November 21, 1977, only six persons in the Katz organization sold parts for GRP, Inc., and that only transmission parts were sold and these persons were utilized for this purpose because according to an affidavit of Peter Arenson sworn to January 6, 1978, they "had discontinued their efforts to sell transmission parts for Preferred." Mr. Bucy, however, testified at his later deposition that there was no sales person only selling transmission parts; Messrs. Arenson had received from an employee of Preferred in July a transmission catalog which, on the back of the last page, showed Preferred's entire line of products and Mr. Katz testified at his later depositions that not only did he not stop selling transmission parts for Preferred prior to November 21, 1977 but to his knowledge no sales associate stopped selling transmission parts products for Preferred prior to November 21, 1977.

During September, October and November of 1977 Mr. Rodney Arenson discussed pricing of their products with members of the Katz organization and plaintiff proved that they set prices slightly below those of

Preferred in order to entice Preferred's customers to switch their orders to Excel.

During the aforesaid months and subsequent to November 21, 1977 the Katz organization not only solicited Preferred's customers on behalf of Excel and Saginaw (another of the Arensons' corporations) but they also utilized Preferred's customer cards in the process.

The proof further showed that in no fiscal quarter after December 1967 did the plaintiffs on a combined basis ever suffer a loss. In the first quarter of 1978 plaintiffs sales revenues were down in excess of $173,000 when compared to the first quarter of 1977, net sales decreased in excess of $170,000 and plaintiff suffered a loss of $61,660 as compared to their profit of $15,040 for the same period in 1977. Based on the foregoing, and upon his knowledge of plaintiffs' financials, Stanley Berger, plaintiffs' accountant for many years, predicted that if such losses continued plaintiffs would be required to liquidate within six months, that during such six-month period plaintiffs would be unable to borrow from any lenders and that plaintiffs would be unable to repay the $150,000 loan which came due in November 1978 which was used to finance the purchase of a computer as indicated above.

■ As indicated above, defendants first moved herein to dismiss plaintiffs' action for want of personal jurisdiction. In view, however, of the manifestly and admittedly false statements contained in their various affidavits filed in support of such motion, this Court has little sympathy for the defendants' motion for such relief. Moreover, it appears that all of the defendants were transacting business within the State of New York under CPLR 302(a)(1) and were "doing business" within the State of New York under CPLR § 301.

For example, Mr. Katz negotiated his original arrangement with plaintiffs during a trip to plaintiffs' Brooklyn facility in 1972 and he thereafter again met with Mr. Poster in New York in 1973 during discussions relating to his March 1973 contract. Furthermore, during the years 1972 through 1977 Mr. Katz travelled to New York several times each year in connection with his sales efforts on behalf of the plaintiffs and was in almost daily telephone contact with plaintiffs in New York. During his numerous visits to New York Mr. Katz concededly picked up customer cards from Preferred, visited potential vendors of parts, received training concerning plaintiffs' product lines, assisted in setting up transmission inventory and engaged in general business discussions with plaintiffs' management. Nonetheless, in his affidavit sworn to January 6, 1978, filed with this Court, he had the temerity to state under oath that "I have never executed or performed a contract in New York and I do not make business related visits to the State of New York." In the case of Mr. Bucy, Mr. Katz testified on at least five of his business visits at the plaintiffs' premises that Mr. Bucy was present, during such visits Mr. Bucy would pick up customer cards, received product training and had business conversations with plaintiffs' management.

Mr. Bucy himself admitted that he made at least 12 trips to Brooklyn during which he received training from the plaintiffs, visited customers in New York and was on all occasions reimbursed for his expenses by the plaintiffs. He also admitted calling on New York customers of the plaintiffs subsequent to November 21, 1971 in connection with his solicitations on behalf of GRP, Inc.

Mrs. Killaly recalled making three trips to plaintiffs' premises in Brooklyn during which she received training and admitted that New York State was part of her territory when she was selling for Preferred and that subsequent to November 21, 1977, twenty percent of the income she has earned in connection with sales for GRP, Inc. is from sales to New York customers.

According to the plaintiffs proof at the hearing, all of the Katz organization sales personnel received training in Brooklyn; each member of the group daily sent orders to New York and was in daily telephone

contact with New York and was engaged in extensive selling to Preferred's New York customers on behalf of GRP, Inc. subsequent to November 21, 1977.

In his affidavit of January 6, 1978, Mr. Peter Arenson had the audacity to state that "the total amount of income G.R.P. (Inc.) derives from sales in New York is less than one (1) percent of its total income from sales. To this day, G.R.P. has derived far less than $1,000.00 from sales in New York." The proof showed, however, that as of November 21, 1977, GRP, Inc. derived in excess of $12,000 from sales to New York customers, such sales accounted for in excess of 5.3% of the sales made by the GRP, Inc.; that during the period from November 22, 1977 through February 17, 1978, GRP, Inc. derived in excess of $34,000 from New York sales and such sales constituted in excess of 6% of all GRP, sales by dollar volume.

Similarly, Mr. Rodney Arenson, in his affidavit of January 6, 1978, stated that: "In fact, the total volume of Excel's business which is derived from transactions in New York is less than one (1) percent. * * * Excel has no connection with Harold Katz, John Bucy or any of the other individual defendants. * * * Excel * * * has never sold any of its products through these individuals * * *." The proof, however, showed that during the immediately preceding 12 months, Excel had purchased automotive parts from several New York suppliers; it had receivables then due to it from its New York customers in excess of $17,-000; its New York receivables constituted 4.7% of its total receivables and that the individual defendants made numerous sales for Excel.

The fact of the matter is that GRP, Inc. was nothing more than a "shell" through which Excel and the Messrs. Arensons' other corporations sold their products utilizing the Katz organization to accomplish the same. There is just no merit to defendants' claims that this Court lacks personal jurisdiction over their persons in this particular case.

■ Turning to the question of plaintiff's entitlement to a preliminary injunction, the law is that plaintiffs are entitled thereto if they have sustained their burden of proof and shown "either a combination of probable success and the possibility of irreparable injury" or have "raised serious questions going to the merits and [have demonstrated] that the balance of hardships tip[s] sharply in their favor". *Stark v. New York Stock Exchange*, 466 F.2d 743, 744 (2d Cir. 1972); *Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969); *Sonesta International Hotels Corporation v. Wellington Associates*, 483 F.2d 247 (2d Cir. 1973); *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Company, Inc.*, 476 F.2d 687 (2d Cir. 1973); *Clever Idea Co., Inc. v. Consumer Products Safety Commission*, 385 F.Supp. 688, 692 (E.D.N.Y.1974); *Moore v. Kibbee*, 381 F.Supp. 834, 837 (E.D.N.Y.1974); *GSE Dynamics, Inc. v. John Doe, et al.*, 381 F.Supp. 1088, 1094 (E.D.N.Y.1974); *Duckett v. Silberman* (75C 1749 E.D.N.Y.1976), aff'd 568 F.2d 1020 (2d Cir. 1978).

Under either or both tests plaintiffs are entitled to a preliminary injunction herein.

■ Under the second of the two tests, the law is that "the burden [of showing probable success] is less where the balance of hardships tips decidedly toward the party requesting the temporary relief * * * [and] the moving party may obtain a preliminary injunction if he has raised questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litigation and thus for a more deliberate investigation." *Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319 at p. 323.

■ In view of the material misstatements made by the defendants in affidavits and pretrial testimony in this case, there is no question but that the plaintiffs have "raised questions going to the merits so serious, substantial and difficult as to make

them a fair ground for litigation and thus for more deliberate investigation."

With respect to the matter of "hardships", plaintiffs showed that from November 22, 1977, to February 17, 1978, the cutoff date on discovery, 81.43% of the customers buying from the Katz organization (GRP, Inc.) were Preferred customers, 82.39% of all sales were to Preferred customers, 80.4% of the dollar volume of all sales was earned from sales to Preferred accounts, and 67.42% of all sales to Preferred customers by dollar volume was of product competitive with that sold by Preferred. In addition, plaintiffs' proof showed that they suffered a loss in the first quarter of 1978 of $61,560 as compared with a profit of $15,040 for the same period in 1977, that their first quarter sales were down in excess of $173,000 from the same period in 1977 and that they were facing the threat of inability to borrow to repay outstanding loans and possible liquidation. At the same time, during the period from August 1977 through February 17, 1978, defendants' sales to plaintiffs customers aggregated in excess of $600,000.

Given all the facts and circumstances herein, there is no doubt in this Court's mind that the "balance of hardships tips decidedly toward" the plaintiffs seeking the temporary relief herein.

On the question of "probable success", the plaintiffs properly claim that the facts in the case at bar are sufficiently similar to those in *Inland Rubber Corporation v. Triple A Tire Service, Inc.*, 210 F.Supp. 880 (S.D.N.Y.1962) as to require a similar disposition in this case. There the Court held in pertinent part that (210 F.Supp. at pp. 883–84):

> "In the case at bar, virtually all of plaintiff's customers do business publicly and from advertised locations somewhere or in some locale in the United States. Presumably, their names, addresses and, in some instances, at least, a general de-

scription of the type of business they conduct is information available from telephone directories, and credit reference directories and trade publications or lists.

"But, as I read the better reasoned cases, these facts do not of themselves take the identity of the customers and related information involved herein out of the class of protected confidential information.

"In a recent important case in this area, *Town & Country House & Home Service, Inc. v. Newbery*, 3 N.Y.2d 554, 558, 170 N.Y.S.2d 328, 331, 147 N.E.2d 724, 726 (1958), the New York Court of Appeals, affirming an order of injunction, stated that former employees ' * * * may not solicit * * * customers who are not openly engaged in business in advertised locations *or* whose availability as patrons cannot readily be ascertained but "whose trade and patronage have been secured by years of business effort and advertising, and the expenditure of time and money, constituting a part of the good will of a business which enterprise and foresight have built up" [emphasis added] (*Witkop & Holmes Co. v. Boyce*, 61 Misc. 126, 131, 112 N.Y.S. 874, 878, affirmed 131 App.Div. 922, 115 N.Y.S. 1150, followed in *People's Coat, Apron & Towel Supply Co. v. Light*, 171 App.Div. 671, 673, 157 N.Y.S. 15, 16, *affirmed* 224 N.Y. 727, 121 N.E. 886).'

"The italicized word 'or' in the above-quoted passage manifests the intention of the Court of Appeals that the fact that customers are publicly advertised does not render their identity non-confidential information, as long as there is the requisite expenditure of time and money in locating and obtaining the patronage of such customers.

"This conclusion does not rest alone on a verbalistic construction of the court's language.

"What is sought to be protected against in these cases is an essentially

unfair exploitation by a former employee of the assets, including trade secrets or other important information, developed by the former employer. The element of unfairness lies chiefly in the expropriation of assets, such as information, which cost the former employer much time and money to develop. In view of this, the availability of names of customers in various directories can have significance only as it bears on the relative ease or difficulty of securing the patronage of those customers. This, in my view, is the clear meaning of the above-quoted passage from the opinion of the Court of Appeals in Town & Country.

"The controlling question, therefore, is whether the identity of plaintiff's customers herein represents such an investment of time and money on the part of plaintiff that the rule of law reiterated in Town & Country forbids the defendants here to turn such information to their own use. I find that it does.

"The Fleet Tire Mart operation acquires most of its customers by means of a significant screening process, described in some detail above. The customers disclosed by such process are special or 'unique', in being willing to purchase, by telephone, a brand of tires not nationally advertised. The identification of a substantial number of such customers represents a cognizable investment of time, effort and money.

"I conclude that the identity of the customers here is confidential, protected information in the meaning of the New York cases. This conclusion is supported by two additional considerations."

In the case at bar, during the five year period of the relationship between the plaintiffs and the Katz organization, the plaintiffs expended some $573,746 for telephone services provided to such organization and paid out approximately $850,000 in commissions. From this substantial expenditure of time and money plaintiffs developed customers which were recorded on customer cards (designed by the plaintiffs) which were utilized by the Katz organization in a sales volume in excess of $2.3 million for the first ten months of 1977, as contrasted with $143,917 for the last ten months of 1972. See also on the question of the expenditure of time and money in the compilation of customer cards and lists: *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 328 N.Y.S.2d 423, 278 N.E.2d 636 (1972); *Hecht Foods, Inc. v. Sherman*, 43 A.D.2d 850, 351 N.Y.S.2d 711 (2d Dept.1974); *Conviser v. J. C. Brownstone & Co.*, 209 App. Div. 584, 205 N.Y.S. 82 (2d Dept.1924; *People's Coat, Apron & Towel Supply Co. v. Light*, 171 App.Div. 671, 157 N.Y.S. 15 (2d Dept.1916), *aff'd* 224 N.Y. 727, 121 N.E. 886 (1918); *Cupid Diaper Service v. Adelman*, 27 Misc.2d 1095, 211 N.Y.S.2d 813 (Sup.Ct. 1961); *McLean v. Hubbard*, 24 Misc.2d 92, 194 N.Y.S.2d 644, aff'd 11 A.D.2d 1084, 208 N.Y.S.2d 443 (4th Dept.1959); *Fleisig v. Kossoff*, 85 N.Y.S.2d 449 (Sup.Ct.1948), aff'd without opinion 275 App.Div. 804, 89 N.Y.S.2d 527 (1st Dept.1949), aff'd without opinion 275 App.Div. 909, 90 N.Y.S.2d 273 (1st Dept.1949); *Witkop & Holmes Co. v. Boyce*, 64 Misc. 374, 118 N.Y.S. 461 (Sup.Ct. 1909), and 61 Misc.2d 126, 112 N.Y.S. 874 (Sup.Ct.1908), aff'd 131 App.Div. 922, 115 N.Y.S. 1150 (4th Dept.1909).

As a second ground for granting the injunctive relief sought by the plaintiff in the *Inland* case, the Court relied upon "the negative covenant alleged to have been subscribed to by the defendants, holding as follows (210 F.Supp. at pp. 884–885):

"Whereas it might be said that such covenants add nothing to the general common law restrictions on the conduct of a former employee, there is a recurrence of language in the cases, where such covenants are *absent*, to the effect that had such covenants been present, plaintiff's position therein would be strengthened. *E.g. Apollo Stationery Co. v. Pilmar*, 15 Misc.2d 91, 182 N.Y.S.2d 637, 640 (1958), *affd.* 9 A.D.2d 649, 192 N.Y.S.2d 475, (1st Dept.1959); *see also, Bates Chevrolet Corp. v. Haven Chevrolet*

*Inc.*, 13 A.D.2d 27, 213 N.Y.S.2d 577, 580 (1st Dept.1961) (' * * * Such interests will be preserved *even* [emphasis added] in the absence of negative covenants in employment contracts * * * ').

"Moreover, the specific inclusion of 'customer lists' in the information protected by the covenant is, whatever the trial court may determine the legal effect of these covenants to be, some evidence now of the confidential and important nature of such information.

"In view of the foregoing, the presence in the case at bar of these covenants substantially increases the probability of plaintiff's ultimate success in a plenary trial on the merits."

While in the case at bar only the defendant Katz executed a "negative covenant", there is no question but that the sales persons in the Katz organization worked for Mr. Katz and under his direction and command and to the extent that one or more of them violated the strictures of the covenants which he made, he must be held responsible therefor. See also on the question of restrictive covenants: *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 328 N.Y.S.2d 423, 278 N.E.2d 636 (1972); *Hecht Foods, Inc. v. Sherman*, 43 A.D.2d 850, 351 N.Y.S.2d 711 (2d Dept.1974); *Peerless Pattern Co. v. Pictorial Review Co.*, 147 App.Div. 715, 132 N.Y.S. 37 (1st Dept.1911); *McLean v. Hubbard*, 24 Misc.2d 92, 194 N.Y.S.2d 644, *aff'd* 11 A.D.2d 1084, 208 N.Y.S.2d 443 (4th Dept. 1959); *Krause v. Gardner*, 99 N.Y.S.2d 592 (Sup.Ct.1050); *Fleisig v. Kossoff*, 85 N.Y. S.2d 449 (Sup.Ct.1948), *aff'd* without opinion 275 App.Div. 804, 89 N.Y.S.2d 527 (1st Dept.1949), *aff'd* without opinion 275 App. Div. 909, 90 N.Y.S.2d 273 (1st Dept.1949); *Friedman v. Stewarts Credit Corp.*, 26 N.Y. S.2d 529 (Sup.Ct.1939), *aff'd* 261 App.Div. 990, 26 N.Y.S.2d 533 (2d Dept.1941); *Witkop & Holmes Co. v. Boyce*, 61 Misc. 126, 112 N.Y.S. 874 (Sup.Ct.1908), *aff'd* 131 App. Div. 922, 115 N.Y.S. 1150 (4th Dept.1909).

In the *Inland* case the District Court also relied on a third consideration, namely, "the nature of the defendant employee's conduct in leaving plaintiff's employ and setting up on his own" (210 F.Supp. at p. 885). In commenting on this consideration, the Court said (210 F.Supp. at pp. 885–886):

"One such factor is tl.at defendant Finkelstein admits that while still in the employ of plaintiff company, he initiated and conducted, with the knowledge and acquiescence of defendants Katz and Nissenberg, negotiations with defendant company, Triple A of Florida, to the end of setting up Triple A of New York in which one or more of the individual defendants were to be principals. While such negotiations looking to post employment activity need not in themselves be reprehensible, their potential inconsistency with loyalty to the employer is a factor to be weighed with others in a case involving the competitive activity of a former employee. *See, Duane Jones Co. v. Burke*, 306 N.Y. 172, 117 N.E.2d 237 (1954).

"Another factor of similar import is that the defendants here, on leaving Inland, took with them certain records containing information on the customers of plaintiff company. There is a substantial dispute as to just what was in fact taken, but the defendants do admit to having taken material.

"A third such factor is presented by allegations that one or more of the defendants, after leaving plaintiff's employ, filled orders which they had obtained on behalf of plaintiff in September, 1962, with tires sold by defendant company."

In the instant case, plaintiffs' proof is even stronger than that in the *Inland* case for here the defendants not only "initiated and conducted * * * negotiations with defendant company * * * to the end of setting up [a competing company] in which one or more of the individual defendants were to be principals" while still associated with the plaintiffs but here they engaged in direct competition with the plaintiffs for the new company while still associated with the plaintiffs. *A fortiori* plaintiffs should

be entitled to injunctive relief in this case. See also on the question of employee conduct: *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 328 N.Y.S.2d 423 (1972); *Duane Jones Co., Inc. v. Burke*, 306 N.Y. 172, 117 N.E.2d 237 (1954); *Conviser v. J. C. Brownstone & Co.*, 209 App.Div. 584, 205 N.Y.S. 82 (2d Dept.1924); *People's Coat, Apron & Towel Supply Co. v. Light*, 171 App.Div. 671, 157 N.Y.S. 15 (2d Dept.1916), *aff'd* 224 N.Y. 727, 121 N.E. 886 (1918); *Peerless Pattern Co. v. Pictorial Review Co.*, 147 App.Div. 715, 132 N.Y.S. 37 (1st Dept.1911); *McLean v. Hubbard*, 24 Misc.2d 92, 194 N.Y.S.2d 644, *aff'd* 11 A.D.2d 1084, 208 N.Y.S.2d 443 (4th Dept. 1959); *Fleisig v. Kossoff*, 85 N.Y.S.2d 449 (Sup.Ct.1948), aff'd without opinion 275 App.Div. 804, 89 N.Y.S.2d 527 (1st Dept. 1949), aff'd without opinion 275 App.Div. 909, 90 N.Y.S.2d 273 (1st Dept.1949); *Friedman v. Stewarts Credit Corp.*, 26 N.Y.S.2d 529 (Sup.Ct.1939), *aff'd* 261 App.Div. 990, 26 N.Y.S.2d 533 (2d Dept.1941); *Witkop & Holmes Co. v. Boyce*, 64 Misc. 374, 118 N.Y.S. 461 (Sup.Ct.1909), and 61 Misc. 126, 112 N.Y.S. 874 (Sup.Ct.1908), *aff'd* 131 App. Div. 922, 115 N.Y.S. 1150 (4th Dept.1909).

Finally, with respect to the question of irreparable injury, the District Court in the *Inland* case held (210 F.Supp. at p. 886):

". . . [T]here is also present a threat of irreparable injury to plaintiff, should its motion for preliminary injunction be denied and defendants allowed to solicit its customers pending resolution of the dispute by a trial on the merits.

"The value of these customer lists is placed in jeopardy by a competitor having, to a substantial degree, equal access to them. Such access destroys the very competitive advantage which was sought and achieved by the expenditure of time and money that has gone into them."

So also in the case at bar plaintiffs have sustained their burden with respect to "possible irreparable injury" by reason of the possible destruction of its "competitive advantage which was sought and achieved by the expenditure of time and money that has gone into" its customer cards, lists, etc., as well as by reason of its economic losses and the real effect of possible liquidation which they have shown.

Accordingly, plaintiffs' motion for a preliminary injunction is granted and upon condition that plaintiffs first give security in the sum of $50,000 for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained, such bond to be approved by this Court or by the Clerk of this Court, it is

ORDERED, that defendants, their officers, agents, servants, employees, and all persons in active concert or participation with any of them who receive actual notice of this order by personal service or otherwise, are hereby enjoined from:

(i) utilizing in any manner plaintiffs' trade secrets including plaintiffs' customer cards or lists and any information contained therein;

(ii) contacting plaintiffs' customers concerning the sale to such customers of any product competitive with plaintiffs product line;

(iii) advising plaintiffs' customers that plaintiffs have ceased to do business or have been taken over by any other company or commenting on or disparaging in any way plaintiffs product;

(iv) advising plaintiffs' customers concerning the matters revealed in connection with the instant action; and

(v) destroying or placing anywhere beyond recovery any papers, or physical record of information taken therefrom which are now in the possession or control of the defendants and were formerly in the files or otherwise under the control of plaintiffs.

SO ORDERED.

[See following agreement]

# PREFERRED

## Electric & Wire Corp.

68 THIRTY–THIRD STREET    BROOKLYN, N. Y. 11232

TELEPHONE:  STERLING 8–1527

Mr. Harold Katz
513 Rutgers Lane
Parsippany, N. J.
March 12, 1973

1. This agreement is without duration but may be terminated by either of us upon thirty days written notice.  Notice should be given to the addresses set forth above.

2. Harold Katz agrees to sell Preferred's Products or that of its subsidiaries as they designate on a full time basis and use his best efforts in connection therewith, as an independent contractor in the territories alloted as his.

3. As full compensation for services to be rendered by you herein, Preferred or its designee will pay Harold Katz a commission between 8% or 14% of the net revenue received by Preferred from sales made through Harold Katz.  When sales are made as designated in the price sheet, Harold Katz shall be entitled to a commission of 14%.  Net revenue shall be determined by adjusting gross revenue for returns, allowances, claims, bad debts and other appropriate deductions of all kinds.  Except as otherwise agreed by us, Harold Katz is responsible for all costs incurred in connection with your selling (except telephone service, for which we are being billed directly by the telephone company), including but not limited to any additional sales personnel hired by Harold Katz.

4. In the event this agreement is terminated for any reason, all rights to commissions shall terminate.  However, so long as the termination is not by Preferred by reason of Katz's violation of any of the term herein the Company agrees to pay Harold Katz commissions on the net revenues, as previously defined from customers serviced and initiated by Harold Katz for a period of six months from the date of notice of termination.

5. Harold Katz represents that he has the right to enter into this agreement and that he is not subject to any agreement which is violated by this contract.

6. Harold Katz agrees that he will not, during the course of this agreement or for one year after termination, (no matter who causes the termination) disclose to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, any information that he receives as a result of his association with the company.

7. Harold Katz agrees not to engage in the sale or marketing to any of Preferred's customers of any products sold by Preferred or competing therewith for a period of two years after date of termination of this contract.

8. Harold Katz agrees that the information on documentation he receives is a valuable and unique asset and therefore all books, records, sales literature and other documents and records that come into Harold Katz's possession by virtue of the association are confidential and remain the property of the company and will be returned to the company promptly upon termination of this agreement.

9. Harold Katz recognizes that a breach of the two previous provisions will result in irreparable harm to the company and in the event of a breach or threatened breach thereof Harold Katz agrees that the company is entitled to an

injunction restraining Harold Katz from such breach of contract. Nothing herein shall prevent Preferred from pursuing any other remedy available to it.

10. No amendment or modification of this agreement shall be valid and binding unless made in writing and signed by the party against whom enforcement thereof is sought.

11. We shall have the right to employ or retain salesmen to perform this same work for which you are retained thereunder.

12. Any waiver by us of any of our rights under this agreement shall not operate as a waiver with respect to any other rights.

<div style="text-align:center">

Very truly yours,

PREFERRED ELECTRIC & WIRE CORP.

/s/ By <u>John F. Poster</u>

</div>

AGREED AND ACCEPTED:

/s/ Harold Katz

<div style="text-align:center">

947 PARKVIEW DRIVE, E–111, KING OF PRUSSIA, PA. 19406

</div>

24 November 1976

Mr. John Poster
Preferred Electric
& Wire Corp.
68 Thirty Third Street
Brooklyn, N.Y. 11232

Dear John:

Effective immediately I will no longer be managing the affairs of General Replacement Parts.

Dean Tryggeseth has agreed to assume all duties and responsibilities until other permanent arrangements can be made.

Thank you for our most rewarding association.

Sincerely yours,

/s/ Harold Katz

HKes

<div style="text-align:center">

[See following illustration]